Howard A. KURZNER and C. A. Kurzner,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 26656.

United States Court of Appeals
Fifth Circuit.

May 27, 1969.

William A. Meadows, Jr., U. S. Atty., Miami, Fla., Mitchell Rogovin, Asst. Atty. Gen., Meyer Rothwacks, Lee A. Jackson, Lester B. Snyder, Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., for appellant; Robert L. Stever, Asst. U. S. Atty., of counsel.

Cyrus A. Neuman, Miami, Fla., Felix. Kniskern, Neuman & Rees, Miami, Fla., for appellees.

Charles L. Ruffner, Miami, Fla., Thomas H. Crawford, Jr., Jacksonville, Fla., amicus curiae.

Before JOHN R. BROWN, Chief Judge, and GEWIN and GOLDBERG, Circuit Judges.

GEWIN, Circuit Judge:

The appellee-taxpayer, Dr. Howard A. Kurzner,[1] is a shareholder and an employee of Gregory Orthopedic Associates, P.A. (hereinafter referred to as GOAPA), an entity organized pursuant to Florida's new Professional Service Corporation Act.[2] He brought suit in the United States District Court for the Southern District of Florida, 286 F.Supp. 839, alleging that the Commissioner of Internal Revenue had assessed and collected from him unlawful and excessive income taxes for the respective taxable years ended August 31 of 1964 and 1965. In accordance with Revenue Procedure

---

1. Although a joint income tax return is involved here, for purposes of this opinion, Dr. Kurzner will be referred to as the appellee-taxpayer.

2. Fla.Stat. ch. 621 (1961). Various provisions of the Act were amended in 1967;

however, since the amendments did not become effective until September 1, 1967, the new provisions were not applicable in the taxable year involved on this appeal.

65–27, the Government did not contest the claim for the 1964 taxable year.[3] With regard to the 1965 claim, however, the Government contended that GOAPA was a partnership for federal tax purposes and that Dr. Kurzner was a fifty-percent partner; therefore, it argued, a fifty-percent interest in the partnership was properly attributable to him. The sole question before the district court was whether GOAPA was a *corporation* within the meaning of subsection 7701(a) (3) of the Internal Revenue Code of 1954. The court, sitting without a jury, answered in the affirmative. The same issue is now before this court on a factually undisputed record and copious briefs submitted by the parties and the Florida Bar as amicus curiae. We affirm the judgment of the district court.

I

Although the background facts concerning the formation and operation of GOAPA are only peripherally relevant,[4] they do place the controversy in context. On September 13, 1961, Dr. Ledford Gerald Gregory, a duly licensed orthopedic surgeon practicing in Dade County, Florida, formed GOAPA for the purpose of acquiring all the assets and liabilities of his medical practice. GOAPA issued fifty shares of stock; Dr. Gregory received forty-eight shares and Drs. Burton Travis and Bernard Halperin, both Dade County physicians, received one share each. Neither of the latter physicians has ever been an employee of GOAPA and neither contributed any capital for his share. In fact, the shares were issued to them under the belief that at least three members of the board of directors had to be shareholders.[5] The three original shareholders were the original officers and directors: Dr. Gregory was president; Dr. Travis was vice-president; and Dr. Halperin was secretary.

On June 1, 1961, GOAPA entered into an employment contract with Dr. Kurzner covering a period of four and three-quarter years.[6] At the same time, Drs. Gregory and Kurzner entered into a buy-and-sell agreement which, among other things, granted the latter an option to purchase twenty-four shares from the former over a three-year period. Subsequently, Dr. Kurzner acquired Dr. Travis' single share of stock and then resold it to one Dr. Ronald Shallow. In December 1962, Dr. Kurzner replaced Dr. Travis as director and vice-president and has continued to serve in those offices.

The amount of the two professional employees' salaries is provided in their respective employment contracts; the amount of bonuses is determined by the board of directors but, in the past, bonuses have been made in accordance with the ratio of stock held by the employee. GOAPA operates out of two separate of-

3. Rev.Proc. 65–27, 1965–2 Cum.Bull. 1017 provides in part:

> Pursuant to section 7805(b) of the Code and section 301.7701–2(a) (5) of the regulations, the rules of section 301.7701–2(h) of the regulations [relating to the status of professional service organizations] shall not be applicable, for taxable years beginning after December 31, 1960, and ending on or before December 31, 1964, to an organization formed as—
>
> \* \* \* \* \*
>
> 6. A so-called professional service corporation \* \* \*, if such organization made its return, filed at or prior to the time (including extensions thereof) that the return for such taxable year was required to be filed, as if its income for such year were subject

to the tax imposed by section 11 of the Code (relating to tax imposed on corporations). The Service will treat any such organization as if it were a corporation for any taxable year for which it meets such requirements.

4. The facts relating to the so-called characteristics of corporateness vis-a-vis GOAPA are given in part III of this opinion.

5. The Attorney General of Florida has issued an opinion holding that a professional service corporation can be formed by a single incorporator. 1961 Op.Att'y Gen.Fla. 061–109.

6. On September 23, 1961, Dr. Gregory had entered into a ten-year employment contract with GOAPA.

fices in Dade County, with the two physicians alternating between the offices. One office has three nonprofessional employees and the other has two.

The board of directors has held regular meetings, both weekly and annually, and has occasionally held a special meeting. The minutes of the meetings were taken in writing and are included in the record before this court. In addition to the business of medical practice, GOAPA has borrowed money on a promissory note and entered into a lease agreement without individual indorsement. It has also established a pension plan for its employees. Moreover, it has filed withholding statements on its employees' income taxes, annual corporate income tax returns, and quarterly Social Security tax returns.

Whether or not GOAPA has "centralized management," its offices are most certainly centrally operated. All stationery used by it bears its name. It maintains a bank account from which all disbursements relating to its business are made and its accounting records are centralized in its name. All bills are issued in its name and all payments are made directly to it. The doctor-employees receive no direct fees and no separate record is kept of the number of patients treated by a particular doctor.

## II

Theoretically this case can be disposed of by defining the term *corporation* and then applying the definition to the entity involved here. The fact is, however, that the statutory "definition" of the term is a mere label; moreover, while the Supreme Court shed some light on the term in the early case of Morrissey v. Commissioner of Internal Revenue,[7] the guidelines given are somewhat imprecise and, consequently, fine distinctions are difficult to make. The only contribution made by the Internal Revenue Code of 1954 to the semantical quandary is the following: "The term 'corporation' includes associations, joint-stock companies, and insurance companies."[8] In the *Morrissey* case, the Court held that a business trust must be taxed as a corporation because the following factors made it "analogous to a corporate organization": (1) it held title to the business property; (2) it furnished the opportunity for centralized management; (3) it was secure from termination or interruption by the death of owners of beneficial interests; (4) it permitted the transfer of beneficial interests without affecting the continuity of the enterprise; and (5) it permitted the limitation of personal liability of participants in the undertaking.[9]

The absence of a statutory definition appears to be a pernicious legacy of a bygone era of federal taxation. The label-definition approach is a carry-over from a time when the rustic simplicity of the label "corporation" was sufficient. The "definition" is virtually unchanged from that given in the Revenue Act of 1918: "the term 'corporation' includes associations, joint-stock companies * * *."[10] The term "partnership" was not defined until the Revenue Act of 1932, which enunciated the set of labels found in the

---

7. 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935).

8. Int.Rev.Code of 1954, § 7701(a) (3). Paragraph (2) of subsection 7701(a) provides:

    The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term

"partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

9. 296 U.S. at 359, 56 S.Ct. 289. The Court also pointed out two features characteristic of an "association": (1) associates and (2) a business objective. These attributes are obviously irrelevant to an analysis of corporateness and we make no further reference to them.

10. Revenue Act of 1918, ch. 18, § 1, 40 Stat. 1057.

1954 Code.[11]  As one commentator has observed: "It may reasonably be assumed that Congress had little doubt that local law labels would suffice."[12] And, indeed, for a time they did suffice well enough. From the first viable federal income tax laws,[13] the privilege of doing business in corporate form—*i. e.*, as an entity organized under state corporation laws—brought a heavier income tax burden than operating in a noncorporate form.[14] The specter of the "double tax" —the tax on income in the hands of the corporation and on dividends in the hands of shareholders—generally ensured that anyone who sought to incorporate was impelled by legitimate economic factors. Moreover, even in closely held businesses where the double-tax scare was less acute—because of the feasibility of drawing off the bulk of taxable income through salaries—incorporation was certainly no avenue to income tax savings. The state label of "corporation" was adequate because it imported incidents of real economic significance; any enterprise to which the benefits of corporateness were not sufficient to overbalance the tax aspects simply would not incorporate.

The approach of the Government in these circumstances was to endeavor to apply the corporate tax laws to any business entity which attempted to obtain the benefits of the corporate form without assuming the corporate label. Thus, in the *Morrissey* case,[15] the apparently tax-inspired entrepreneurs put a business enterprise in a trust but tried to operate as much as possible like a corporation. The Supreme Court found the corporate resemblance close enough and upheld the Commissioner's determination that the trust was a corporation for federal tax purposes. Thus, the Commissioner succeeded in rendering the concept of a corporation sufficiently flexible to thwart the avoidance of corporate taxes by the mere failure to incorporate. Indeed, a

11. Except for the substitution of the word "title" for "Act" in the present Code, the definitions are identical. *Compare* Int.Rev.Code of 1954, § 7701(a) (2), note 8 *supra*, *with* Revenue Act of 1932, ch. 209, § 1111(a) (3), 47 Stat. 289 (1932).

12. Scallen, Federal Income Taxation of Professional Associations and Corporations, 49 Minn.L.Rev. 603, 622 (1965). Professor Scallen's article is one of the most thorough and objective treatments of the tax status of professional service corporations extant; we consider his reasoning the most persuasive of the ten or so articles considered by the court.

13. The first income tax was imposed by the Act of August 5, 1861, ch. 45, 12 Stat. 292, but it was repealed the following year by the Act of July 1, 1862, ch. 119, § 89, 12 Stat. 473, and a license tax was substituted. An income tax was subsequently imposed by the revenue act of 1894, Act of August 27, 1894, Ch. 349, 28 Stat. 509, but it was declared unconstitutional by the Supreme Court almost immediately. Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759 (1895). In 1909, the Congress tried again and, this time, the tax was upheld. Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389 (1911). Then, in 1913, the sixteenth amendment was ratified, thus paving the way for further "direct" tax legislation.

14. The revenue act of 1909 imposed a tax on "every corporation, joint-stock company or association, organized for profit and having a capital stock represented by shares," but imposed no tax on other business entities. Act of August 5, 1909, ch. 6, § 38, 36 Stat. 112. The 1913 act substantially equalized treatment between corporate and non-corporate entities; nevertheless, certain corporations still paid taxes on some income not taxed at all in non-corporate businesses. Act of Oct. 3, 1913, ch. 16, 38 Stat. 166. With the advent of the Revenue Act of 1916, a relatively weak version of the so-called double tax came into being, *viz*, a tax on corporate earnings in addition to a tax on distributed dividends.

15. 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935). The *Morrissey* case was one of a tetralogy of cases decided the same day on the same question; the other three cases were Swanson v. Commissioner of Internal Revenue, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273 (1935); Helvering v. Combs, 296 U.S. 365, 56 S.Ct. 287, 80 L.Ed. 275 (1935); and Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278 (1935).

subsequent victory arguably stretched the concept beyond the point of flexibility.[16]

While the Commissioner was busily drawing ostensibly noncorporate entities into the corporate ring, changes in the revenue laws were opening new doors to tax savings which, in some instances, could be very favorable. Since the so-called double tax can be more theoretical than real in owner-operated businesses, the enactment of provisions permitting additional tax benefits to corporations would constitute positive attractions to incorporation. In the context of the present case, probably the most important innovations were the acts authorizing corporations to set up profit-sharing and pension plans on a favorable tax basis.[17] At some point in time, the cat peeped out of the fog: tax advisors began to realize that, for some proprietors, the corporate tax laws were more advantageous than those applicable to noncorporate entities. Thus, in United States v. Kintner,[18] a group of doctors which had operated as a partnership adopted articles of association which appear to have been designed to reflect the incidents of corporateness enunciated in Morrissey and Pelton v. Commissioner of Internal Revenue.[19] The new association began filing corporate tax returns and also adopted a pension plan. Relying heavily upon the *Pelton* case—which purported to apply the criteria laid down in *Morrissey*—the Ninth Circuit rejected the Commissioner's contention that the association should not be taxed as a corporation.

As guardian and protector of the public exchequer, the Commissioner's attitude toward the new "corporations" quite expectably changed. While previously the IRS had sought to expand the statutory definition in order to include as many corporate-appearing entities as possible, the new approach was to narrow the definition and exclude the clamoring welter of associations seeking corporate status. However, two factors impeded the desired turnabout. First, the statutory and regulatory definitions did not suggest a reversal of the trend. The statutory definition was a set of mere labels which indicated that the term corporation includes *associations* but excludes *partnerships*. The regulatory definitions applicable in the immediate pre-*Kintner* era were substantially those promulgated under the Revenue Act of 1934. Articles 801–2 and 801–4 of Regulations 86 provided respectively:

> Association.—The term "association" is not used in the Act in any narrow or technical sense. It includes any organization, created for the transaction of designated affairs, of the attainment of some object, which, like a corporation, continues notwithstanding that its members or participants change, and the affairs of which, like corporate affairs, are conducted by a single individual, a committee, a board, or some other group, acting in a representative capacity. It is immaterial whether such organization is created by an agreement, a declaration of trust, a statute, or otherwise. It includes a voluntary association, a joint-

16. Pelton v. Commissioner of Internal Revenue, 82 F.2d 473 (7th Cir. 1936). *But see* Mobile Bar Pilots Ass'n v. Commissioner of Internal Revenue, 97 F.2d 695 (5th Cir. 1938).

17. These plans were initially authorized in the revenue acts of 1921 and 1926 respectively, and subsequently refined. 4A Mertens, Law of Federal Income Taxation § 25B.02 (1966). Of course, the attractiveness of the corporate form stemmed from other factors as well. *See* Eaton, Professional Corporations and Associations in Perspective, 23 Tax L.

Rev. 1, 22–24 (1967). It may also be observed that the desire for pension and profit-sharing plans is not purely a tax motive; insofar as the desire is for economically feasible retirement and work-incentive plans, it is clearly a non-tax motive. However, it is appropriate to note that we intimate no view whatever as to the effect of section 269 of the Internal Revenue Code of 1954 in regard to professional service corporations.

18. 216 F.2d 418 (9th Cir. 1954).

19. 82 F.2d 473 (7th Cir. 1936).

stock association or company, a "business" trust, a "Massachusetts" trust, a "common law" trust, an "investment" trust (whether of the fixed or the management type), an inter-insurance exchange operating through an attorney in fact, a partnership association, and any other type of organization (by whatever name known) which is not, within the meaning of the Act, a trust or an estate, or a partnership. If the conduct of the affairs of a corporation continues after the expiration of its charter, or the termination of its existence, it becomes an association.

Partnerships.—The Act provides its own concept of a partnership. Under the term "partnership" it includes not only a partnership as known at common law but, as well, a syndicate, group, pool, joint venture, or other unincorporated organization which carries on any business, financial operation or venture, and which is not, within the meaning of the Act, a trust, estate, or a corporation. On the other hand the Act classifies under the term "corporation" an asociation or joint-stock company, the members of which may be subject to the personal liability of partners. *If an organization is not interrupted by the death of a member or by a change in ownership of a participating interest during the agreed period of its existence, and its management is centralized in one or more persons in their representative capacities, such an organization is an association taxable as a corporation.* As to the characteristics of an association, see also articles 801–2 and 801–3. [Emphasis added.] [20]

The expansiveness of the definition of the term association—and, consequently, of the term corporation—is the essential import of these provisions, but it is most graphically shown by the penultimate sentence of article 801–4 italicized above. To be a corporation, an entity need not

shield its owners from personal liability; it need only be centrally managed and survive the transfer of an interest or the death of an owner. These regulations are diametrically opposed to a restrictive construction of the term *corporation*; they make perfectly clear that the position of the IRS was that any borderline or doubtful case would be resolved in favor of corporateness.

The second factor impeding the IRS turnabout was its initial victories in the courts, the most important of which were the *Morrissey* and *Pelton* cases. In *Morrissey*, the question before the Court was whether a business trust was a trust or an association for federal tax purposes. The Court described the attributes of the business trust as follows:

The trustees were declared to be without power to bind the beneficiaries personally by "any act, neglect, or default," and the beneficiaries and all persons dealing with the trustees were required to look for payment or indemnity to the trust property. The beneficial interests were to be evidenced solely by transferable certificates for shares which were divided into 2,000 preferred shares of the par value of $100 each, and 2,000 common shares of no par value, and the rights of the respective shareholders in the surplus, profits, and capital assets were defined. "Share ledgers" showing the names and addresses of shareholders were to be kept.

The trustees might convene the shareholders in meeting for the purpose of making reports or considering recommendations, but the votes of the shareholders were to be advisory only. The death of a trustee or of a beneficiary was not to end the trust, which was to continue for twenty-five years unless sooner terminated by the trustees.[21]

On these facts, the Court found the trust "analogous to a corporate or-

---

20. Article 801–3, as indicated by its heading, "Association distinguished from Trust," set out criteria for distinguishing an association from a trust.

21. 296 U.S. 344, 347–348, 56 S.Ct. 289, 291 (1935).

ganization." In making its determination, the Court articulated some, but perhaps not all, of the distinguishing attributes of "corporateness." [22]

The first of these corporate characteristics is described succinctly by the Court: "A corporation, as an entity, holds the title to the property embarked in the corporate undertaking." [23] In the context of the case *sub judice*, the important point here is that this factor is inherently a matter of state law. Insofar as an entity is empowered by the local legislature to hold title to the property of the enterprise, the entity will possess at least one corporate attribute.

The second corporate characteristic is described as follows: "Corporate organization furnishes the opportunity for a centralized management through representatives of the members of the corporation." [24] Probably the most salient aspect of this description is that it merely refers to an opportunity. Since the Court was listing characteristics actually possessed by corporations in general, obviously it could not state that corporations must have centralized management. It is common knowledge that some corporations do not have complete centralization of management.[25] Thus the Court articulated the feature which is definitely characteristic of all corporations, *viz.*, the corporate setup makes centralized management by a board of directors feasible.

The third attribute of corporateness, according to the *Morrissey* Court, is being "secure from termination or interruption by the death of owners of beneficial interests * * *." [26] Since continuity of the *enterprise* is as much a characteristic of a partnership as of a corporation—*i. e.*, on the level of feasibility—the Court here apparently was referring to the fact that a partnership generally suffers a "dissolution" upon the death of a partner. Two matters are worthy of notice in this context. First, the factor given here is again solely determinable by state laws. And second, the criterion is almost wholly formal because its significance is virtually limited to the fact that surviving partners would have to execute a new partnership agreement while surviving shareholders would not have to draft new articles of incorporation.

The fourth characteristic given in *Morrissey* is that corporate organization "facilitates * * * the transfer of beneficial interests without affecting the continuity of the enterprise, and also the introduction of large numbers of participants." [27] The Court here appears to mean by the word "facilitates" that exchange and distribution of interests in an enterprise are easier where an exchange does not effect a dissolution and where interests are represented by share certificates. There is no intimation that the Court intended to say that share exchange and distribution are easy in all corporations. Since the Court was speaking of "universal" attributes, its language was carefully restricted: the corporate setup makes it possible to ex-

---

**22.** The Court did not purport to state a complete list of corporate characteristics; the discussion of corporateness was in response to this question:

> What, then, are the salient features of a trust—when created and maintained as a medium for the carrying on of a business enterprise and sharing its gains—which may be regarded as making it analogous to a corporate organization?

296 U.S. at 359, 56 S.Ct. at 296.

**23.** *Id.* at 359, 56 S.Ct. 289.

**24.** *Ibid.*

**25.** The degree of management centralization seems to be a function of two inter- related factors: the singularity or plurality of the product of the enterprise and the hierarchical structure of authority within the enterprise. Obviously a single-product manufacturer with a single chain of pyramidal management authority will possess far greater centralization than a personal service company in which each employee who performs the service is equally qualified and for which each instance of rendering the service is a different "product." Between these two extremes are various gradations of centralized control.

**26.** 296 U.S. at 359, 56 S.Ct. at 296.

**27.** *Ibid.*

change and distribute shares easily—a subjunctive clause being necessarily implicit—*if* the economic realities of the particular enterprise are adequately conducive. Additionally, it may be observed that the feasibility of exchanging an interest in an enterprise without causing a dissolution is again (1) a largely formal attribute and (2) a factor entirely controlled by local law.

The last characteristic imparted by the Court was that the corporate form "permits the limitation of liability of participants to the property embarked in the undertaking." [28] Here again, the Court's language is carefully chosen: the corporate form *permits* limitation. The Court does not say that shareholders are not personally liable for their acts, for they certainly are in many instances when they personally act on behalf of the corporation. The concept of limited liability does not exist as an ideal form above and apart from its legal and economic setting. The corporate form permits the limitation of liability but, for rather obvious reasons, an active participant cannot claim the same protection as a mere investor. Like the other characteristics articulated by the Court, limitation of liability is a matter of state law; however, unlike the other attributes, the limitation facet is not merely formal, but actually imports considerable economic substance. In this regard, limitation of liability may well be the most significant of the so-called *Morrissey* criteria.

In discussing corporate characteristics, it must not be overlooked that a "corporation" need not possess all the attributes discussed in *Morrissey*. The Court there stated: "The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity." [29] Thus an entity may be a corporation for federal tax purposes even though it is something less under state law. The ambiguity and imprecision of the *Morrissey* criteria stem from the fact that it is virtually impossible to determine at what point an association "degenerates" into a partnership. The Court emphasized similarity but unfortunately did not specify a requisite degree of similarity. Moreover, the Court gave no indication of the relative weight to be accorded the corporate attributes discussed. While the economic substantiality of limited liability might have suggested its preeminence, the Court stated it rather cursorily and only after describing the other factors. Although somewhat unaccountable, this treatment of the limited-liability feature is perfectly consistent with Regulations 86 which, as already indicated, did not even list limited liability as a necessary characteristic. [30]

The next "victory" of which the Commissioner is now much aggrieved occurred in the *Pelton* case. [31] There the IRS had determine that a medical clinic which operated in the form of a trust was an association. *Morrissey* and its companion cases were handed down while *Pelton* was on appeal and the Seventh Circuit found those cases dispositive of the issue. The attitude of the *Pelton* court was entirely uncritical. Since the *Morrissey* tetralogy had involved the trust form, the court seems to have regarded the question of corporateness as settled. [32]

In view of the breadth given the corporate classification by the IRS and the courts, it is hardly surprising that the

28. *Ibid.*

29. *Id.* at 357, 56 S.Ct. at 295.

30. See text accompanying note 20 *supra*.

31. 82 F.2d 473 (7th Cir. 1936).

32. Although the Supreme Court in each of the *Morrissey* tetralogy and the Seventh Circuit in *Pelton* uncritically asserted the presence of limited liability, there is considerable doubt about the matter. "It is uniformly held that, if the cestuis [que trust] may dictate on questions of the management of the trust, they are liable for the debts." Bogert, Trusts and Trustees § 294, at 582 (2d ed. 1964) ; *see* Restatement (Second) of Agency § 14B (1958). In *Pelton* and two of the tetralogy—Swanson v. Commissioner of Internal Revenue, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273 (1935), and Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278 (1935)—the cestuis actually managed the trusts.

Commissioner's attempted retroversion was wholly unsuccessful. The only case which seemed to support the new position was Mobile Bar Pilots Ass'n v. Commissioner of Internal Revenue,[33] in which the IRS had sought to tax a nonprofit cooperative organization of pilots as a corporation. The Fifth Circuit found, in effect, that the association was less a business than a clearing house and relay station for independent bar pilots; accordingly, the court held that *Morrissey* and *Pelton* were not controlling. Thus the *Mobile Bar Pilots* case was an extremely narrow oar for the kind of back-paddling the IRS was attempting.

In 1954, the Ninth Circuit held in *Kintner* that a medical group was sufficiently corporate in form to constitute an association for federal tax purposes. Although the *Kintner* group was not in trust form, its attributes were substantially similar to the *Pelton* clinic—even to the extent of asserting a kind of limited liability.[34] The IRS immediately announced that it would not follow *Kintner*[35] even though it had not sought certiorari. Five years after *Kintner*, the IRS suffered another defeat in Galt v. United States[36] which involved a medical association similar to the *Kintner* group. The IRS filed a notice of appeal but then stipulated its dismissal. It seems probable that the reason for the Government's appellate surrender in *Galt* was the impendency of new anti-*Kintner* regulations whose efficacy might be undermined by another judicial rebuff. Before the new regulations were approved, another district court in Foreman v. United States[37] found another medical associa-

tion to be a corporation. No appeal was taken from this decision.

In the latter part of 1960, the so-called Kintner Regulations[38] were promulgated by the IRS. The obvious object of those regulations was to cut back the broad definition of the term *corporation* given by the courts and previous regulations. Since the Kintner Regulations as published in 1960 are not applicable in the present case, their full import need not be detailed here. Several aspects of the regulations illustrate their tenor. The test of corporateness was reduced to four equally weighted procrustean criteria: (1) continuity of life; (2) centralization of management; (3) limited liability; and (4) free transferability of interests. Needless to say, the definitions of these corporate attributes—referred to in the regulations as characteristics of a "pure" corporation—were obviously intended to make the corporation club more exclusive; indeed, the regulations state explicitly that any entity "subject to a statute corresponding to the Uniform Partnership Act" cannot possess the first three characteristics. The regulations state: "An organization will be treated as an association if the corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust."[39] Although each of the corporate elements was defined more restrictively,[40] the real stiletto amongst the fronds was the exclusion of entities subject to a partnership act; the prevalence of such acts ensured the exclusion of most professional groups.

33. 97 F.2d 695 (5th Cir. 1938).

34. The court stated: *"Only the members [of the group] were to be liable to third parties for professional misconduct."* 216 F.2d 418, 420 (9th Cir. 1954) (court's emphasis).

35. Rev.Rul. 56–23, 1956–1 Cum.Bull. 598. A subsequent ruling, Rev.Rul. 57–546, 1957–3 Cum.Bull. 886, hinted that a change of position was imminent, but the change never materialized.

36. 175 F.Supp. 360 (N.D.Tex.1959).

37. 232 F.Supp. 134 (S.D.Fla.1964).

38. Treas.Reg. §§ 301.7701–1 to –11 (1960), T.D. 6503, 1960–2 Cum.Bull. 409.

39. Treas.Reg. § 301.7701–2 (1960).

40. For excellent discussion of the corporate attributes under the Kintner Regulations, see Scallen, note 12 *supra*, at 671–94; Comment. Professional Associations and Professional Corporations, 16 Sw.L.J. 462, 468–69 (1962).

It had become evident since *Kintner* that the people most interested in an expansive definition of "association" were professionals who traditionally had been unable to incorporate. Consequently, the Kintner Regulations were aimed primarily at professionals. However, while plowing under many budding corporations, the IRS planted what it must now surely regard as an evil seed: "[L]ocal law governs in determining whether the legal relationships which have been established in the formation of an organization are such that the standards are met." [41] Professionals throughout the country took their case to the local legislatures. The result is that today, by either statute or rule, the vast majority of states permit professionals to incorporate and, in addition, attempt to confer upon the new organizations the corporate attributes required by the Kintner Regulations. [42] The Florida statute involved in the instant case is one of those statutes.

In 1965, the IRS responded to the new statutes with amendments to the Kintner Regulations which, rather incredibly, isolate professional groups and state in no uncertain terms that they cannot be corporations for federal tax purposes. Since the adoption of the 1965 amendments, the IRS has attempted in a number of cases to enforce the new rules. The judicial response has been unanimous: the courts have invalidated the amended regulations as being arbitrary and discriminatory legislation by an administrative agency which is only authorized to interpret congressional acts. [43]

## III

There can be no doubt whatever that Gregory Orthopedic Associates, P.A. is a corporation under the *Morrissey* case and the regulations prior to the 1965 amendments. Each of the corporate attributes articulated in *Morrissey* is expressly provided by the Florida act. The power to hold title to the property of the enterprise is granted by section 621.08 which states in part:

[N]othing in this act or in any other provisions of existing law applicable to corporations shall be interpreted to prohibit such [professional] corporation from * * * owning real or personal property necessary for the rendering of professional services. [44]

The opportunity for centralized management is available to professional corporations to the same extent as any other corporation under Florida law. Section 621.13 of the Professional Service Corporation Act makes Florida's general corporation laws applicable in all instances not specifically covered by the provisions of the act. [45] Under section 608.09 of the general corporation laws, [46] the board of directors is the governing body of the corporation. Thus the policy and direction of a professional service corporation enamates from a centralized body.

Additionally, a professional corporation is "secure from termination or interruption by the death of owners." The corporate *entity* continues to exist after the withdrawal of a shareholder as in

41. Treas.Reg. § 301.7701–1(c) (1960).

42. Eaton, note 17 *supra*, at 8–9; Snyder & Weckstein, Quasi-Corporations, Quasi-Employees and Quasi-Tax Relief for Professional Persons, 48 Cornell L.Q. 613, 656–58 (1963); Note, Professional Corporations and Associations, 75 Harv.L. Rev. 776, 779–80 (1962).

43. O'Neill v. United States, 410 F.2d 888 (6th Cir. 1969), aff'd 281 F.Supp. 359 (N.D.Ohio 1968); United States v. Empey, 406 F.2d 157 (10th Cir. 1969), aff'g 272 F.Supp. 851 (D.Colo.1967); Smith v. United States, 301 F.Supp. 1016

(S.D.Fla.1969); First Nat'l Bank & Trust Co. v. United States, (N.D.Okla. 1969) [No. 68–C–28, March 4, 1969]; Cochran v. United States, 299 F.Supp. 1113 (D.Ariz.1969); Wallace v. United States, 294 F.Supp. 1225 (E.D.Ark. 1968); Holder v. United States. 289 F. Supp. 160 (N.D.Ga.1968); Kurzner v. United States, 286 F.Supp. 839 (S.D. Fla.1968).

44. Fla.Stat. § 621.08 (1961).

45. Fla.Stat. § 621.13 (1961).

46. Fla.Stat. § 608.09 (1955).

any other corporation.[47] The ability of the *enterprise* to continue depends upon the presence of some other person or persons willing and able to carry on the business. Again, a professional service corporation is not substantially different from any other corporation in this regard and it is perfectly identical to non-professional service corporations. If a business organization is not large enough to have someone capable of continuing the operation or lucrative enough to entice someone into the business, it cannot continue to function as an enterprise.

A professional corporation also facilitates the transfer of shares without affecting the continuity of the enterprise and permits the introduction of a large number of participants. The transfer of shares no more affects the entity of a professional corporation than any other corporation. Moreover, even though the act confines transferability of shares to professionals and requires approval of a transfer by a majority vote of shareholders,[48] transferability of the shares of a professional corporation is no more restricted than many—if not most—closely held corporations. As one authority has observed:

> Provisions restricting transfer in the close corporation are * * * so common and universally sanctioned by the courts that we must conclude that the mere *theory* (rather than the fact) of

free transferability is sufficient to sustain continuous existence.[49]

Finally as a corporation,[50] a professional service corporation "permits the limitation of liability of participants to the property embarked in the undertaking." However, in a seeming excess of caution, section 621.07 of the act made clear that the shareholder-professionals would not be immune from liability for their own conduct:

> Any officer, shareholder, agent or employee of a corporation organized under this Act shall remain personally and fully liable and accountable for any negligent or wrongful acts or misconduct committed by him, or by any person under his direct supervision and control, while rendering professional service on behalf of the corporation to the person for whom such professional services were being rendered.[51]

Since the scope of the personal liability imposed by this section was unclear, the Florida legislature in 1967 added a clarifying proviso:

> [T]he personal liability of shareholders of a corporation organized under this act, in their capacity as shareholders of such corporation, shall be no greater in any aspect than that of a shareholder-employee of a corporation organized under [the general corporation laws] chapter 608.[52]

---

47. *See* 1 Hornstein, Corporation Law and Practice § 16 (1959).

48. Fla.Stat. § 621.11 (1961). In 1967, this section was amended to eliminate the requirement of majority approval of transfers as well as other provisions. Effective as of September 1, 1967, section 621.11 provides:
    No shareholder of a corporation organized under this act may sell or transfer his shares in such corporation except to another individual who is eligible to be a shareholder of such corporation.
    As originally enacted Florida's Professional Service Corporation Act was rather rough hewn; the act was drafted in hasty response to the Kintner Regulations and some of the provisions indicate

insufficient legislative consideration. *See* Buchmann & Bearden, The Professional Service Corporation—A New Business Entity, 16 U.Miami L.Rev. 1, 6–14 (1961). In 1967, the Florida legislature amended several provisions of the act in an obvious effort to cure some of the deficiencies in the original draft.

49. 1 Hornstein, Corporation Law and Practice § 19 (1959).

50. *Id.* at 20.

51. Fla.Stat. § 621.07 (1961).

52. Fla.Stat § 621.07 (1967). *See* Jacobs, Florida's Professional Service Corporation Act, 42 Fla.B.J. 149, 155 (1968). The Government invites us to speculate that the Florida courts might construe the original section 621.07 to impose

Thus personal liability is limited in a professional corporation to the same extent as in any other corporation. Although a shareholder-employee must necessarily be responsible for his misconduct, the corporate form nonetheless shields the shareholder from a considerable amount of contractual and tort liability.

Although the Kintner Regulations significantly altered the definition of the term *association* in order to restrict the corporate class, it is perfectly clear that GOAPA is a corporation under those regulations. Example (1) of those regulations, which was eliminated by the 1965 amendments, stated:

A group of seven doctors forms a clinic for the purpose of furnishing, for profit, medical and surgical services to the public. They each transfer assets to the clinic, and their agreement provides that except upon complete liquidation of the organization on the vote of three-fourths of its members no member has any individual interest in its assets. Their agreement also provides that neither the death, insanity, bankruptcy, retirement, resignation nor expulsion of a member shall cause the dissolution of the organization. Under the applicable local law, on the occurrence of such an event, no member has the power to dissolve the organization. The management of the clinic is vested exclusively in an executive committee of four members elected by all the members, and under the applicable local law, no one acting without the authority of this committee has the power to bind the organization by his acts. Members of the clinic are personally liable for all debts of, or claims against, the clinic. Every member has the right to transfer his interest to a doctor who is not a member of the organization, but he must first advise the organization of the proposed transfer and give it the opportunity on a vote of the majority to purchase the interest at its fair market value. The organization has associates and an objective to carry on business and divide the gains therefrom. *While it does not have the corporate characteristics of limited liability, it does have the characteristics of centralized management, continuity of life, and a modified form of free transferability of interests.* The organization will be classified as an association [i. e., a corporation] for all the purposes of the Internal Revenue Code.[53]

In this example, the medical clinic has (1) centralization of management solely on the facts that the clinic is managed by a committee and that acts unauthorized by the committee are not binding on the clinic; (2) continuity of life solely on the fact that a withdrawal from the clinic does not effect or permit a dissolution; and (3) "a modified form of free transferability" solely on the fact that shares may be exchanged only after a first refusal by the majority stockholders. On the other hand, the clinic provides no limited liability at all.

On the basis of Example (1), GOAPA is easily classified as a corporation; it not only provides the very important ele-

---

virtually unlimited liability. We decline this invitation for several reasons. First, since the statute was amended in 1967, there is probably scant likelihood that a definitive construction of the original section will be forthcoming. Second, since the amendment was merely an added proviso, it appears to be in the nature of a clarification; thus, even if the Florida courts construed the original provision, the probabilities are clearly against the construction suggested by the Government. And third, we have more

than a little hesitation about determining corporateness by what some court might possibly do at sometime in the future; we think the more appropriate course is to accept the reasonable meaning of presently existing legal provisions. *Cf.* Grayck, Professional Associations and the Kintner Regulations: Some Answers, More Questions, and Further Comments, 17 Tax L.Rev. 469, 488–89 (1962).

53. Treas.Reg. § 301.7701–2(g) (1960) (emphasis added).

ment of limited liability,[54] but also has each of the other attributes. As to centralization of management, the facts are stipulated that its board of directors established the corporation's policies [55] and made all decisions concerning bonuses for the employees, the hiring and firing of nonprofessional employees, and the work schedules and vacations of the physicians. The bylaws state:

> The Board of Directors shall have the management and control of the business of the company, and in addition to the power and authority by these By-Laws conferred upon them, may exercise all such powers and do all such things as may be exercised or done by the corporation, but subject nevertheless, to the laws of Florida, and these By-Laws.

Thus it is quite clear that the authority to perform acts which bind the corporation must derive from the board of directors.

With regard to continuity of life, GOAPA has the same status as any other corporation; under the corporation laws of Florida, it is not dissolved by the withdrawal of a shareholder and no shareholder can require its dissolution. Finally, on the matter of transferability of interests, the Florida statute permits a transfer of shares upon majority stockholder approval and, after September 1, 1967, without any approval.[56] Drs. Kurzner and Gregory partially anticipated the matter of transfer or withdrawal by an agreement which states in part:

> KURZNER agrees that in the event he leaves the employ of the CORPO-RATION for any reason whatsoever other than involuntary military service, he will resell to GREGORY all of the stock owned by KURZNER at the time of the severance of employment.

On these facts, the shares of GOAPA were substantially as transferable as the clinic's shares in the example; consequently, it must be regarded as providing at least the "modified" free transferability accorded the exemplified clinic.

Under the Kintner Regulations, all that is necessary for corporate status is that the entity possess more than half the four characteristics of corporateness. Even under those regulations, GOAPA had three of the corporate attributes completely and one partially. Thus it is clear that, prior to 1965, it would have been classified as a corporation under the applicable regulations.

## IV

■ The most significant addition made by the 1965 amendments to the Kintner Regulations was a new paragraph (h) entitled "Classification of professional service organizations." [57] According to the Government, the new paragraph did not change the meaning of corporateness but merely "defined, with particular applicability to professional service organizations, the various corporate characteristics previously set forth in the 1960 Regulations and in *Morrissey*." This proposition cannot withstand scrutiny. Paragraph (h) was obviously designed to thwart the efficacy of state professional association acts to confer corporate status under the Kintner Regulations. With regard to at least three

---

54. Hornstein, Corporation Law and Practice § 20, at 20 (1959): "In practical importance this feature [limited liability] for over a century has outranked all the other consequences we have been discussing * * *."

55. Dr. Kurzner testified on the Government's deposition as follows:
   Q Who arrives at the amount [of a bill] to send to the patient—the doctor who actually starts off with the patient?

   A Yes. But, as I said, we discussed this thoroughly and we set a policy of certain rates and then it is up to the individual. We will vary it somewhat according to the difficulty of the case. The individual has a variance, in other words, the basis varies according to the difficulty he has with each case.

56. See note 48 *supra*.

57. Treas.Reg. § 301.7701-2(h) (1967).

of the corporate characteristics given,[58] the paragraph isolates an attribute of professional corporate organizations— generally an aspect essential to professional practice—and declares that attribute repugnant to corporateness.

Thus subparagraph (2), concerning continuity of life, states in pertinent part:

If local law, applicable regulations, or professional ethics do not permit a member of a professional service organization to share in its profits unless an employment relationship exists between him and the organization, and if in such case, he or his estate is required to dispose of his interest in the organization if the employment relationship terminates, the continuing existence of the organization depends upon the willingness of its remaining members, if any, either to agree, by prior arrangement or at the time of such termination, to acquire his interest or to employ his proposed successor. The continued existence of such a professional service organization is similar to that of a partner-

ship formed under the Uniform Partnership Act whose business continued pursuant to an agreement providing that the business will be continued by the remaining members after the withdrawal or death of a partner * * *, and is essentially different from the continuity of life possessed by an ordinary business corporation. Consequently, such a professional service organization lacks continuity of life.

With regard to centralization of management, subparagraph (3) states in pertinent part:

[A]lthough a measure of central control may exist in a professional service organization, the managers of a professional service organization in which a member retains traditional professional responsibility cannot have the continuing exclusive authority to determine all of the matters described in the preceding sentence [setting forth areas of required centralized control.] Instead, such measure of control is no more than that existing in an ordinary large professional partnership

---

58. Nominally, the same four characteristics are stated; in paragraph (h), however, they are referred to as the attributes of the "ordinary business corporation" which apparently was taken from Bittker, Professional Associations and Federal Income Taxation: Some Questions and Comments, 17 Tax L.Rev. 1, 3 n. 5 (1961). The "ordinary business corporation"—as used by Professor Bittker and the IRS—appears to be a corporation which is not a personal service corporation or a closely held corporation. Since our approach to the present case is more comparative than definitive, it does not matter, for our purposes, how corporateness is determined. However, in our view, the positing of a nonexistent ideal form against which to measure corporate characteristics seems to leave more than a little to be desired. The difficulty with asserting preeminent, subsisting "attributes" is that one must then rationalize the absence of the attributes in some kinds of corporations which are unquestionably corporations (e. g., personal service corporations and closely held corporations). It would appear to us far preferable to adopt the Supreme

Court's approach in *Morrissey*, viz., positing as corporate attributes only those characteristics which all corporations possess. *Morrissey* indicates that the Code definition of "corporation" includes all traditionally recognized corporations and, in addition, includes some business entities which merely resemble traditionally recognized corporations (e. g., associations). The approach of Professor Bittker and the IRS holds that some traditionally recognized corporations do not rise to the dignity of "pure" corporations but are actually only associations because they do not measure up to the attributes of the ideal form. In our view, this approach is supported by neither logic nor law. However, except insofar as the ideal-form approach clashes with our holding in the case *sub judice*, we have not attempted to redefine terms for the Commissioner. Our conclusion in this case is that GOAPA has the important attributes of some traditionally recognized corporations and, a fortiori, it very closely resembles traditionally recognized corporations; therefore, it is a *corporation* for purposes of the Internal Revenue Code and must be taxed accordingly.

which has one or more so-called managing partners and in which a member retains the traditional professional autonomy with respect to professional decisions and the traditional responsibility of a professional person to the client or patient. Such measure of central control is essentially different from the centralization of management existing in an ordinary business corporation. Therefore, centralization of management does not exist in such a professional service corporation.

Subparagraph (4) states the new rule on limitation of liability in pertinent part as follows:

A professional service organization has the corporate characteristic of limited liability only if the personal liability of its members, in their capacity as members of the organization, is no greater in any aspect than that of shareholder-employees of an ordinary business corporation.

The relevant part of the new transferability-of-interests rule is stated in subparagraph (5):

[I]f a member of a professional service organization who possesses such an interest [in the organization] may transfer his interest to a qualified person who is not a member of the organization only after having first offered his interest to the other members of the organization at its fair market value, the corporate characteristic of free transferability of interests does not exist.

These provisions are so patently and radically arbitrary that they require very little discussion. The Government has not even attempted to explain how the provisions of paragraph (h) can be reconciled with Example (1) of the Kintner Regulations.[59] The medical clinic in Example (1), which is accorded corporate status, is considerably less "corporate" than the professional service associations which are denied corporate status under paragraph (h). Yet the Government, in apparent seriousness, continues to insist that the new paragraph merely explains the 1960 regulations.

A professional service corporation is virtually identical in operation to a nonprofessional service corporation, the real difference—for tax purposes—being that professionals have traditionally been barred from operating in corporate form while nonprofessionals have not. Since December 31, 1921, personal service corporations have been taxed as corporations rather than partnerships.[60] There is no reason, in either policy or fact for different tax treatment of various kinds of personal service corporations. The preclusion of professional service corporations from corporate status is wholly arbitrary and discriminatory and, therefore, cannot and will not be countenanced by this court. Since 1936 the courts have permitted professional associations to achieve corporate status; the professional groups in *Pelton, Kintner, Galt,* and *Foreman* attest to this fact. If Congress has intended to exclude professional groups from corporate status, it seems quite likely that it would have passed legislation to counteract these judicial decisions.

In *Morrissey* the Supreme Court rejected an attack on the Commissioner's change in his regulations, stating:

As the statute merely provided that the term "corporation" should include

59. See text accompanying note 53 *supra.*

60. The revenue act of 1918 had provided that personal service corporations were to be taxed as partnerships. Revenue Act of 1918, ch. 18, § 218(e), 40 Stat. 1070 (1919). As indicated in part II of this opinion, at that time in tax history, corporate status was regarded as undesirable and personal service corporations were said to have been "relieved from the payment of tax as a corporation." S.Doc. No. 391, 65th Cong., 3d Sess. 3 (1919). The "relief" was carried over into the Revenue Act of 1921, but by the terms of the act, ceased to be effective after December 3, 1921. Revenue Act of 1921, ch. 136, § 218(d), 42 Stat. 245.

"associations," without further definition, the Treasury Department was authorized to supply rules for the enforcement of the act within the permissible bounds of administrative construction. Nor can this authority be deemed to be so restricted that the regulations, once issued, could not later be clarified or enlarged so as to meet administrative exigencies or conform to judicial decision.[61]

As we have shown in part II of this opinion, the Commissioner's amendments to the regulations since *Morrissey* have been bold attempts not to conform but to avoid judicial decisions. Moreover, the only apparent expediency served by the amendments has been the collection of more taxes; in this regard, we need only observe that the courts have not yet become so cynical as to subscribe to the tax-dollar school of statutory construction.

Regulations embodying a contemporaneous or long-standing interpretation of a statute must be accorded great weight by the courts.[62] The regulations directly involved in this case are those contained in new paragraph (h) of the regulations which became effective January 1, 1965.[63] Thus paragraph (h) is neither a contemporaneous nor a long-standing interpretation; in fact, however, our view of it would be the same in any event. The new paragraph (h) of the regulations is arbitrary, discriminatory, and legislative in nature; it is therefore invalid. Since we have determined that the professional corporation involved here qualifies as a corporation under the pre-1965 reg-

ulations,[64] we need not decide whether the 1960 regulations are valid.

Accordingly, the judgment of the district court is affirmed.

Affirmed.

---

61. 296 U.S. 344, 354–355, 56 S.Ct. 289, 294 (1935).

62. *See* Bingler v. Johnson, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969).

63. Treas.Reg. § 301.7701–2(a) (5) (1965).

64. The appellee and the amicus curiae in this case have argued that the state of Florida has conferred corporateness upon GOAPA and that the state label is controlling. We reject this argument and our conclusion, as should be obvious,

does not rest upon a state label. Except insofar as reference to entities generally regarded as corporations is necessary for determining corporateness, the label bestowed by the state upon a business enterprise is irrelevant. *Compare* Bittker, Professional Service Organizations: A Critique of the Literature, 23 Tax L. Rev. 420, 431–34 (1968), *with* Anderson, Tax Aspects of Professional Corporations, U.So.Calif.1963 Tax.Inst. 309, 317–19.