JEROME J. ROUBIK AND JOAN M. ROUBIK, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3095-68, 3105-68—3107-68.   Filed December 3, 1969.

*Louis Maier* and *Henry J. Gefke*, for the petitioners.

*Gerald P. Moran*, for the respondent.

TIETJENS, *Judge*: The Commissioner determined deficiencies in income taxes of petitioners in these consolidated cases as follows:

| Petitioner | Taxable year | Deficiency |
|---|---|---|
| Jerome J. Roubik | 1962 | $174. 58 |
| | 1963 | 228. 65 |
| | 1964 | 226. 45 |
| Jerome J. Roubik and Joan M. Roubik | 1965 | 557. 77 |
| Theodore J. Pfeffer | 1961 | 3, 092. 10 |
| | 1962 | 3, 678. 72 |
| | 1963 | 4, 913. 88 |
| | 1964 | 4, 534. 53 |
| | 1965 | 7, 338. 51 |
| James E. Ramin and Jean Ramin | 1961 | 578. 18 |
| | 1962 | 897. 18 |
| | 1963 | 1, 037. 63 |
| | 1964 | 1, 077. 21 |
| | 1965 | 2, 001. 62 |
| Alvin B. Zautcke | 1961 | 610. 52 |
| Alvin B. Zautcke and Ranae Zautcke | 1962 | 734. 80 |
| | 1963 | 868. 46 |
| | 1964 | 905. 28 |
| | 1965 | 1, 583. 07 |

[1] Cases of the following petitioners are consolidated herewith: Theodore J. Pfeffer, docket No. 3105-68; James E. Ramin and Jean Ramin, docket No. 3106-68; and Alvin B. Zautcke and Ranae Zautcke, docket No. 3107-68.

Only the deficiencies determined for 1965 are in dispute. The only issue presented for decision by us for that year is whether certain amounts of income resulting from the performance of professional services by each of the individual petitioners during 1965 were earned by and taxable as income to "Drs. Pfeffer, Ramin, Zautcke & Associates, Chartered," a professional service corporation, or whether they were earned by and taxable to the individual petitioners.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference.

Theodore J. Pfeffer resided in Wauwatosa, Wis., at the time he filed his petition herein. James E. Ramin and Jean Ramin, husband and wife, resided in Milwaukee, Wis., at the time they filed their petition herein. Alvin B. Zautcke and Ranae Zautcke, husband and wife, resided in Elm Grove, Wis., at the time they filed their petition herein. Jerome J. Roubik and Joan M. Roubik, husband and wife, resided in Wisconsin Rapids, Wis., at the time they filed their petition herein. All the petitioners filed Federal individual income tax returns for 1965 with the district director of internal revenue, Milwaukee, Wis.

Theodore J. Pfeffer, James E. Ramin, Alvin B. Zautcke, and Jerome J. Roubik (hereinafter referred to as Pfeffer, Ramin, Zautcke, and Roubik, respectively) were during 1965 and for some years prior thereto physicians licensed to practice medicine in Wisconsin and specializing as radiologists.

Pfeffer has been engaged in the specialty of radiology since 1938. From 1947 to 1956, he was employed as chief of radiology at the Veterans' Administration Hospital, Wood, Wis.

In 1956 Pfeffer contracted with the Felician Sisters of St. Francis Hospital to become chief and director of radiology at St. Francis Hospital in Milwaukee. This employment continued throughout 1965 pursuant to a second contract entered into by him, individually, and the hospital on July 14, 1961. The professional services to be rendered by Pfeffer under this contract were to consist of:

1. Complete supervision of the Radiological Department including X-Ray diagnosis, radiation therapy of all kinds, admission photo-roentgen chests, and radio isotope diagnosis and therapy, and if possible to participate in research of interest to individual members of the Medical Staff.

2. Conduct and participate in teaching programs for residents, interns, medical technologists and nurses in the field of Radiology.

3. Render consultation services to the Hospital Medical Staff.

4. Render service to the hospital staff concerning health matters of general hospital welfare such as radiation protection, and periodic photo-roentgen chest surveys.

5. Participate and attend such sectional staff meetings, and clinical conferences as necessary.

6. Provide complete and adequate coverage at all times for supervision of the Radiological Department, and be available for consultations upon request. During periods of absence, the Chief and Director will provide for the services of an Associate Radiologist.

7. At all times the Radiological Department shall be conducted to meet the standards required by the Joint Commission of Accreditation of Hospitals and by the American Medical Association, in order to obtain and maintain approval for Intern and Residency Training Programs. It is understood that the professional qualifications of the Radiologist, and any Associate Radiologist must be such as to make them eligible for appointment to Marquette Medical School Faculty.

8. The Chief and Director and any Associate shall offer their professional services in carrying out clinical and Scientific Investigations and would reflect credit to the Hospital and the Medical Profession.

9. The Chief and Director and Any Associate will carry his own Liability Insurance, and furnish the Hospital with a certificate of same.

10. It is understood that the Radiologist will determine the type and performance of technical procedures.

11. It is further understood that the employment of technical help, and the procurement of equipment will be recommended jointly by the Radiologist and the Sister Radiological Supervisor.

12. It is agreed that all rates, fees, and charges for Radiological examinations will be fixed by joint action of the Chief and Director, and the Sister Administrator.

13. To be familiar with and cooperate willingly and sincerely with the policies of Administration and Management of St. Francis Hospital as established by the rules of the Felician Sisters.

14. Fees to be paid Dr. Theodore John Pfeffer for the provision of professional services previously mentioned will be determined as follows:

> twenty-five percent of the Gross Charges of the Radiological work at the established Radiology Fee Schedule, minus authorized free work, payable the 10th of each month for the services rendered during the previous month.

Either party was given the right to terminate the contract upon 90 days' written notice. If not terminated the contract was to be automatically renewed from year to year.

For some years prior to 1961, Pfeffer provided radiology services to the Clinic of Internal Medicine, a partnership engaged in the practice of internal medicine.

Prior to 1961 Pfeffer personally contracted to employ other doctors as he needed to meet his commitment to provide radiology services at St. Francis Hospital and at the Clinic of Internal Medicine. He paid these doctors directly. Ramin, Zautcke, and Roubik were so employed by Pfeffer prior to 1961.

Ramin finished his residency July 1, 1959, when he began work at St. Francis Hospital, Sacred Heart Sanitarium, St. Mary's Hill Hospital, and at a private practice at 1915 West Hampton. In 1959 he purchased the practice at 1915 West Hampton.

In 1959 Zautcke took an additional year of training at St. Lukes Hospital and started providing radiology services for Westgate Medical Lab and X-Ray. In August of 1959 he began working full time for the physicians at Westgate Medical Lab and X-Ray. In 1960 he began performing radiology services for Dr. Joseph Zimmer at 8410 West Cleveland, and for Pfeffer at St. Francis Hospital. By 1961 Zautcke had a substantial private practice receiving income for services which he provided at the Westgate Medical Lab and X-Ray, and for Zimmer, Pfeffer, Drs. Jabling and Malloy, and the Wisconsin Department of Public Welfare.

Roubik began work for Pfeffer in 1959, performing radiology services at St. Francis Hospital and the Clinic of Internal Medicine for which he was paid on a per diem basis.

During 1961 Pfeffer, Ramin, Zautcke, and Roubik formed a corporation pursuant to the provisions of "The Service Corporation Law," Wis. Stat. sec. 180.99.

On October 30, 1961, the articles of incorporation of "Dr. Pfeffer & Associates, Chartered" were executed, filed in the office of the secretary of state of Wisconsin and recorded in the office of the register of deeds of Milwaukee, Wis. A certificate of incorporation, dated November 7, 1961, was issued by the secretary of state of Wisconsin. Subsequently, amendments to the articles of incorporation were adopted changing the name of the corporation to "Drs. Pfeffer, Ramin, & Associates, Chartered" and later to "Drs. Pfeffer, Ramin, Zautcke & Associates, Chartered." Hereinafter the corporation will be referred to as Pfeffer Associates. Pfeffer, Ramin, Zautcke, and Roubik entered into a subscription agreement on November 28, 1961, subscribing for the following number of shares: Pfeffer, 60 shares; Ramin, 20 shares; Zautcke, 10 shares; and Roubik, 10 shares. The subscribed shares were issued for $10 a share. The shares were represented by certificates which were delivered to each subscriber for his number of shares. Subsequently, Zautcke purchased 5 shares from Pfeffer and 5 shares from Roubik. The subscribers adopted bylaws and elected a board of directors. On the same day, the subcribers, constituting the board of directors, met and elected the following officers: President, Pfeffer; vice president and secretary, Ramin; assistant secretary, Zautcke; assistant secretary, Roubik. By resolution the board established the annual compensation for the corporation's professional employees to be as follows: Pfeffer, $30,000; Ramin, $21,000; Zautcke, $19,800; and Roubik, $4,320. The board also adopted a pension plan, designated the Whitefish Bay State Bank as depository of corporate funds, and authorized the procurement of disability, health, and professional liability insurance coverage for the corporation's professional employees. Pfeffer Associates continued to be a corporation in good standing under the laws of Wisconsin throughout 1965.

Pfeffer, Ramin, Zautcke, and Roubik each entered into a separate written employment agreement with Pfeffer Associates. The pertinent terms of the agreements, which were identical except for salary, were as follows:

### ARTICLE 1. EMPLOYMENT RELATIONSHIP

1.1. The employer hereby employs the employee for the period hereinafter set forth as a physician in the specialty of Radiology, at the various hospitals, clinics, offices and institutions served by the employer. Assignments of employee and all other employees to the places of employment, shall be made by the President, or, in his absence or disability, by the Vice-President, in accordance with the general policies as may be adopted from time to time by the Board of Directors. The employer, through its proper officers, reserves the right to assign and change any assignment of employee and of all other employees at such locations and to such duties, including the reading of X-rays, fluoroscopy, and X-ray therapy as may be necessary or advisable from time to time.

1.2. The employee agrees to accept said employment and to devote his entire time and attention exclusively to the medical practice of the employer in the specialty of radiology, except where the employee or other employees of employer may be employed on a more or less full time basis by institutions such as Veterans Administration. It is not intended that such activities shall be included within the scope of this employment agreement, and only the practice of the profession outside of his duties with institutions such as Veterans Administration, shall be included within the terms of this agreement.

### ARTICLE 2. PERIOD OF EMPLOYMENT

2.1. The period of employment under this agreement shall begin on November 7, 1961, and shall end on December 31, 1962, provided, however, that unless the employer gives notice to the employee on or before November 1, 1962, of its intention to terminate this agreement on December 31, 1962, then and in such event the period of employment shall continue from year to year, provided, however, that this agreement may be cancelled by either party giving to the other party notice of its intention to terminate this agreement on the end of the second calendar month following the month during which such notice is given.

2.2. All notices of either party to terminate this agreement shall be given in writing and sent by Registered Mail, addressed to the other party as herein provided. The notice to the employer shall be given to an executive officer other than the employee at the registered office of the corporation. Notice to the employee shall be given at his latest home address, as indicated on the records of the corporation.

### ARTICLE 3. VACATIONS, MEETINGS & DAYS OFF

3.1. During the first year of employment with employer or a predecessor, the employee shall be entitled to two (2) weeks of vacation with full pay. During the second, third and fourth years of employment with employer or a predecessor, the employee shall be entitled to three (3) weeks of vacation with full pay. During the fifth and subsequent years of employment by the employer or a predecessor, the employee shall be entitled to four (4) weeks of vacation with full pay. Vacations are to be computed on a calendar year basis, and may not be accumulated from year to year. Any leave of absence in excess of vacation schedule shall be taken by the employee without pay.

3.2. The employee shall be granted one (1) week with pay to attend medical meetings in each calendar year, provided, however, that the employee shall pay all expenses in connection with the attendance at such meetings.

## ARTICLE 4. DISABILITY

4.1. In the event of total disability of the employee due to illness or other incapacity, the employee's base salary shall be continued according to the following schedule:

For the first six (6) months—100%
For the next six (6) months— 50%

4.2. Any amounts payable to the employee on account of insurance, the premiums for which are paid by the corporation, shall be deducted from any payments made pursuant to this Article. In the event that the payments from insurance policies exceed the above schedule, such payments shall be in lieu of payments payable by the employer and no deductions or adjustments shall be made which would reduce the insurance payments to the employee.

4.3. Any bonus payments to which the employee would otherwise be entitled shall be reduced by the proportion that the months of disability bear to the calendar year during which disability payments are payable. If the disability extends more than six (6) months, no bonus shall be payable.

4.4. Where all payments pursuant to Section 4.1. shall have been made, no further disability compensation will be paid until such employee returns to the practice of his profession with the corporation on a full time basis.

## ARTICLE 5. COVENANT NOT TO COMPETE

5.1. Upon termination of employment, the employee covenants and agrees that except with the prior written consent of the corporation, signed by two (2) of the executive officers of the corporation, he will not engage in the practice of the specialty of Radiology, a branch of the practice of medicine, in any way, in any hospital, clinic, office or other institution with which the corporatoin or any shareholder or any employee thereof has contracts with respect to the practice of Radiology, or with which the corporation or a shareholder or an employee thereof has started negotiations for such a contract during the period while the terminating employee was an employee of the corporation, nor may such employee practice the specialty of Radiology within a one (1) mile radius of any present or future office of the corporation. Such restriction shall continue for a period of three (3) years from and after the termination of employment or existence of the corporation or any successor thereto, whichever period of time is shorter.

## ARTICLE 6. ARBITRATION OF DIFFERENCES

6.1. Any important differences as may arise between the parties hereto with reference to this agreement, or the construction thereof, or any matters dealt with arising under this agreement, shall be referred to three (3) arbitrators, one of whom shall be appointed by either party hereto desiring arbitration; one by the other party hereto; and the third shall be chosen by the other two so appointed. The decision of the majority of the three arbitrators shall be final. A party desiring to have any matter determined by arbitration hereunder, shall select his appointee and notify the other party thereof. When so notified, the other party shall, within thirty (30) days likewise select his appointee and give notice thereof.

6.2. In the event either party hereof shall refuse or neglect to appoint his arbitrator in the time prescribed, the other party may apply to the Judge of any Court of record of Milwaukee County to appoint an arbitrator for and on behalf of such a person.

ARTICLE 7. COMPENSATION

7.1. The employee shall be entitled to a base compensation of * * * per year, payable in monthly installments of * * * each.

7.2. In addition to base compensation, the employee shall be paid a bonus computed as follows:

(1) After payment of base salaries, the deduction of operating expenses and all other proper deductions, but before deduction of taxes on income, the net profits shall be determined.

(2) The net profits so determined shall be allocated among the professional employees entitled to a bonus according to the ratio by which the fees received by the corporation on account of services rendered by the employee bear to the total fees received by the corporation for professional services rendered by all professional employees.

(3) For purposes of allocating fees, the fees resulting from the operation of any office by the corporation, shall be reduced by the direct expenses attributable to the operation of such office, including, but not limited thereto because of enumeration herein, such items as salaries, rent, and other direct expenditures.

(4) The bonuses shall be computed on a quarterly basis and shall be payable within twenty (20) days after the end of each calendar quarter.

ARTICLE 8. AMENDMENT

8.1. This agreement shall be subject to amendment or modification at any time by written agreement of the parties.

8.2. It is contemplated that the base compensation of the employee hereunder may be changed from time to time. Such change may be made by a writing executed by the proper officers of the corporation and by the employee involved and attached to this agreement. Such change shall be authorized by the Board of Directors, and in making such change, the employee involved shall not be eligible to vote in respect to his own compensation.

IN WITNESS WHEREOF, the employer has caused this agreement to be executed by its proper officers and its corporate seal to be affixed and the employee has hereunto set his hand and seal at Milwaukee, Wisconsin, this _____ day of _____, 1962.

During 1965 Pfeffer Associates maintained checking accounts in the name of "Pfeffer, Ramin, Zautcke & Associates, Chartered" at the First Wisconsin National Bank, Milwaukee, and at the Whitefish Bay State Bank, Milwaukee. Each of the following petitioners and officers possessed signatory authorization for the signing of checks drawn on such accounts:

Theodore J. Pfeffer, president and treasurer
James E. Ramin, vice president and secretary
Alvin B. Zautcke, assistant secretary

Substantially all of the amounts reported as gross receipts of the corporation on its 1965 Federal income tax return were deposited in such accounts and substantially all of the amounts reported as expenses and claimed as deductions on such tax return were disbursed from such accounts by checks which bore the name "Pfeffer, Ramin, Zautcke & Associates, Chartered." Records were kept to show how

much income was turned over to the corporation by each associate and the amount of expenses incurred by him which were paid by the corporation.

Subsequent to the incorporation of Pfeffer Associates, Pfeffer, Ramin, Zautcke, and Roubik continued to engage in the practice of radiology substantially as they had before its incorporation.

Pfeffer continued to be chief and director of radiology at St. Francis Hospital under his 1961 contract. There was no modification of this contract prior to the close of 1965. For the entire year 1961 and for the first 4 months of 1962, St. Francis Hospital continued to make its checks payable to Pfeffer. Thereafter, upon his request to the supervisor of the Radiological Department, an employee of the hospital, the hospital's checks were made payable to Pfeffer Associates. This change in the name of the payee was not authorized by the administrator of the hospital who had no knowledge of it until shortly before the trial of this case. Ramin, Zautcke and Roubik continued during 1965 to perform radiology services for Pfeffer much as they had before the incorporation of Pfeffer Associates, except that Pfeffer employed the following procedure for paying them during 1965. In that year St. Francis Hospital paid Pfeffer by monthly checks payable to Pfeffer Associates a total of $103,638.87. Upon receipt of each month's check, Pfeffer would draw up a report allocating portions of the income to Ramin, Zautcke, and Roubik on the basis of their month's work for him at the hospital and the clinic. Ramin, who did not work at the clinic, was paid for his work at the hospital at an annual rate of $9,000, while Zautcke and Roubik were paid on a production basis for their work at the hospital and the clinic. Zautcke worked at the clinic only very occasionally during the first half of 1965. During the second half he worked 1 or 2 days a week at the clinic. During 1965 he spent more time there than Pfeffer. He worked two or three mornings a week at the hospital. Roubik worked at the hospital and the clinic. The monthly report and the check would be mailed to Ramin at his Hampton Avenue office where Pfeffer Associates kept a cash receipts journal. The check would be entered on the cash receipts journal and would be deposited in Pfeffer Associates' checking account at the Whitefish Bay State Bank. Accountant's worksheets were kept in Ramin's office crediting each associate with the income allocated to him.

During 1965 Pfeffer was a partner in the Clinic of Internal Medicine. His income from the partnership during 1965, totaling $22,409.73, was similarly accounted for except that all of this income was allocated to Pfeffer on the accountant's worksheets.[2] Upon Pfeffer's request

---

[2] Apparently Zautcke and Roubik were paid for their work at both the hospital and the clinic by means of Pfeffer's monthly allocation of St. Francis Hospital's checks.

starting on September 30, 1965, the clinic made its checks payable to Pfeffer Associates rather than to Pfeffer, although this was objected to by several of his partners. All of the clinic's checks were either mailed to or picked up by Pfeffer. The checks were then deposited in Pfeffer Associates' account at the Whitefish Bay State Bank.

During 1965 Pfeffer spent approximately 10 percent of his time at the clinic, 90 percent of his time being devoted to St. Francis Hospital.

During 1965 Ramin was engaged principally in his practice of radiology at 1915 West Hampton Avenue (hereinafter referred to as the Hampton office). Ramin leased the office in 1959 and continued to occupy the office under a nonexecuted lease through 1965. He owned all of the equipment at the Hampton office and he claimed depreciation on it on his 1965 return. He was not paid by Pfeffer Associates for the use of his equipment, nor was he reimbursed for his automobile expenses which he deducted on his 1965 return. Ramin interviewed and hired all of the Hampton office personnel, who performed their work under his exclusive supervision. He generally held himself out to the public as "James E. Ramin, Diagnostic Radiology." He had exclusive responsibility for the conduct of the Hampton office. The invoices for drugs and supplies and services purchased by the Hampton office were addressed to and submitted in the name of James E. Ramin, individually. Payments for these supplies and services were made by check drawn on Pfeffer Associates. Receipts to Ramin's patients at the Hampton office were issued under the name of "Drs. Pfeffer, Ramin, and Associates, Chartered, 1915 West Hampton Avenue." Pfeffer has never provided any services at the Hampton office and there is no evidence that he had ever been in that office. Zautcke "covered" at the Hampton office about five times during 1965 when Ramin was sick or on vacation. Roubik occasionally "covered" at the Hampton office.

All of the income from Ramin's Hampton office practice was deposited in Pfeffer Associates' checking account. On Pfeffer Associates' accountant's worksheets Ramin was credited with all of such income, and was charged with all the expenses of the office, including rent under his lease of the office, drugs and supplies, telephone, etc.

Ramin was also employed during 1965 as chief of radiology at Sacred Heart Sanitarium and as chief of radiology at St. Mary's Hill Hospital. The services performed by Ramin at Sacred Heart Sanitarium were pursuant to a contract (substantially identical in its terms with Pfeffer's 1961 contract with St. Francis Hospital) entered into between him, individually, and the sanitarium. At Ramin's request Sacred Heart made its 1965 checks payable to Pfeffer Associates. It issued an I.R.S. Form W-2 showing payments of $10,970.66 paid in 1965 to Dr. James E. Ramin. St. Mary's Hill made its checks payable

to Pfeffer Associates and issued an I.R.S. Form 1099 indicating it as payee. Zautcke and Roubik occasionally "covered" for Ramin at these institutions. Ramin turned over all the income he earned from these institutions to Pfeffer Associates.

During 1965 Ramin also performed radiology services for the East Troy Clinic, Summit Hospital, Drs. Brown and Nolan, Hustisford Hospital, Milwaukee County, Dr. Verdone, Dr. Marks, Dr. DePaul, and Dr. Kohn. Drs. Brown and Nolan paid Ramin by checks issued to "Drs. Pfeffer, Ramin, Zautcke & Asso. Chartered." These checks were deposited in Pfeffer Associates' account with the Whitefish Bay State Bank. Neither Pfeffer, Zautcke, nor Roubik performed any services for these persons. All the income from services performed for these persons was turned over to Pfeffer Associates and was credited on the accountant's worksheets to Ramin.

During 1965 Zautcke was engaged in the private practice of radiology at two offices, hereinafter referred to as the Cleveland office and the Fairview office.[3] At the Cleveland office, Zautcke hired all the personnel who were subject to his exclusive supervision. He owned all of the equipment in the office, which was leased by him individually. His stationery and office bills were issued under the name "A. B. Zautcke, M.D., Radiologist." His telephone was answered, "Dr. Zautcke's office." From the Cleveland office he submitted bills to Blue Shield under his individual name, and Blue Shield's checks were issued payable to Zautcke, individually, for the submitted bills. Zautcke was not subject to supervision by Pfeffer Associates in the conduct of his practice at his Cleveland office. He generally held himself out to the public as "A. B. Zautcke, M.D., Radiologist." On occasion Ramin "covered" for Zautcke at the Cleveland office.

All Zautcke's receipts from the Cleveland office were turned over to Pfeffer Associates, which paid his Cleveland office expenses.

Zautcke was also employed during 1965 as administrative head of the X-ray department at the West Side Hospital pursuant to a contract entered into between himself individually and the hospital, the pertinent terms of which are as follows:

the parties hereto mutually agree as follows:

1. The Doctor will assume the responsibility for the proper conduct of the X-ray department and will devote such time as is necessary to provide complete and adequate service.

2. That the Doctor will carry and maintain malpractice insurance at his own expense.

3. Conduct and operate the X-ray department as administrative head, be responsible for the selection of employees with the mutual consent of the administrator.

---

[3] The Fairview office income has always been treated as earned by Zautcke individually, and is not involved in this case. The Cleveland office income is purported to have been earned by and to be taxable to Pfeffer Associates.

4. Offering technical facilities of the X-ray department giving professional consel [sic] to members of the staff.

Determination of standard fees and charges for X-ray services in mutual agreement with the administrator.

Rendering of professional courtesy and of charity, to be determined by mutual consent with the Hospital policies as follows:

No charge for:

1. Clergy.
2. True cases of charity.
3. All members of the attending medical staff.
4. All full time employees of the Hospital.
5. Except those having a prepaid insurance plan to cover X-ray fees.
6. Partial payment cases of hardship determined on same basis as hospital bill on mutual consent of Hospital and Doctor.

The fees for all X-ray services shall be collected by the Hospital, the name of the Doctor shall appear on the Hospital bill.

40% of the gross X-ray charges will be paid to the Doctor. Charity and courtesy and employees as cited will constitute the only adjustment of gross charges. Payments will be determined by the close of business each month and payment made by the 10th of the following month.

\*         \*         \*         \*         \*         \*         \*

The Doctor shall be free to engage in private consultation and professional association with other institutions and other activities of his interest.

During periods of absence, the Doctor shall arrange to have professional work of the X-ray department covered by a Radiologist at no expense to the Hospital.

The Doctor shall be available for emergency calls.

The Doctor shall be a member of the Hospital staff.

This agreement shall be for one year from date and may be terminated or altered at any time by notice in writing delivered by one party to the other not less than 120 day prior to the time fixed for termination.

The bills to Zautcke's patients at the West Side Hospital were issued under his individual name, as required under his contract. The West Side Hospital made its checks for radiology services payable to "A. B. Zautcke," who endorsed them over to Pfeffer Associates. Ramin and Roubik "covered" for Zautcke at the West Side Hospital. The West Side Hospital was never informed that Zautcke was associated with Pfeffer Associates. Zautcke turned over all his income from the West Side Hospital to Pfeffer Associates. During 1965 Zautcke continued to work for Westgate Medical Lab and X–Ray, maintaining the professional relationship he had established in 1959. Westgate continued during 1965 to issue its checks to Zautcke. It was not aware of the existence of Pfeffer Associates during that year. Zautcke also worked for Dr. Damiano, Dr. Slatnik, Dr. Rand, Dr. Thompson, Dr. Hutchins, and Dr. Oswald. Ramin "covered" for Zautcke at Westgate. Neither Pfeffer, Ramin, nor Roubik ever performed services for any of these last named persons. There is no evidence that they were ever informed of Zautcke's association with Pfeffer Associates. All the income earned by Zautcke from these doctors was turned over to Pfeffer Associates.

During 1965 Roubik was a full-time salaried employee of the Veterans' Administration Hospital in Wood, Wis. (hereinafter referred to as the VA). He was employed on a 40-hour work week, Monday through Friday, and was on call to perform radiology services after work hours and on weekends when needed. He also performed radiology services for Dr. Pfeffer at the Clinic of Internal Medicine and at St. Francis Hospital. Roubik's primary responsibility was with the VA, although he was permitted to perform outside work when he was not needed there. During 1965 he usually worked about 10 hours a week at St. Francis Hospital and about 10 hours a week at the Clinic of Internal Medicine for which he was credited with $9,475 of income on the accountant's worksheets, in accordance with Pfeffer's monthly reports of his production. Roubik occasionally "covered" at the Hampton office, Sacred Heart, St. Mary's Hill, and Westside hospitals.

Pfeffer turned over the following amounts of income to Pfeffer Associates during 1965:

| | |
|---|---|
| St. Francis Hospital | $103,638.87 |
| Clinic of Internal Medicine | 22,409.73 |
| Total | 126,048.60 |

In accordance with his monthly reports the income from St. Francis Hospital was credited as follows:

| | |
|---|---|
| Pfeffer | $66,038.87 |
| Ramin | 9,000.00 |
| Zautcke | 19,125.00 |
| Roubik | 9,475.00 |
| Total | 103,638.87 |

Accordingly, Pfeffer was credited on the accountant's cash receipts journal with the following amounts of income:

| | |
|---|---|
| St. Francis Hospital | $66,038.87 |
| Clinic of Internal Medicine | 22,409.73 . |
| Total | 88,448.60 |

Ramin, Zautcke, and Roubik were similarly credited in the cash receipts journal with income which they had turned over to the corporation during 1965:

RAMIN

| | | | |
|---|---|---|---|
| Hampton Office | $25,864.35 | Milwaukee County | $1,973.19 |
| Sacred Heart Sanitarium | 10,342.66 | Dr. Kohn | 1,309.60 |
| St. Francis Hospital | 9,000.00 | Dr. DePaul | 436.00 |
| Drs. Brown and Nolan | 7,482.00 | Dr. Marks | 250.00 |
| Summit Hospital | 4,422.25 | Miscellaneous | 165.65 |
| Hustisford Hospital | 3,922.00 | Cross Coverage | 2,900.00 |
| St. Mary's Hill Hospital | 3,786.60 | | |
| Dr. Verdone | 3,594.50 | Total | 77,774.80 |
| East Troy Clinic | 2,326.00 | | |

## ZAUTCKE

| | | | |
|---|---|---|---|
| Cleveland Office | $40,076.22 | Dr. Thompson | $60.00 |
| St. Francis Hospital | 19,125.00 | Dr. Hutchins | 81.00 |
| West Side Hospital | 15,758.80 | Dr. Oswald | 63.33 |
| Westgate Medical | 9,927.12 | Cross Coverage | (2,900.00) |
| Dr. Damiano | 574.20 | | |
| Dr. Slatnik | 1,800.98 | Total | 84,640.65 |
| Dr. Rand | 74.00 | | |

## ROUBIK

St. Francis Hospital _____ $9,475.00

Total _____ 9,475.00

Pfeffer Associates was during 1965 an electing "small business corporation," having made an election under section 1372(a), I.R.C. 1954, which was in effect for that year. It filed a Form 1120–S return for 1965. The following schedule reflects the allocation of income and expenses for 1965 as reflected in the corporation's accountant's workpapers and reflects the totals of such income and expense items as shown on the Form 1120–S return:

| | Dr. Pfeffer | Dr. Ramin | Dr. Zautcke | Dr. Roubik | Per Form 1120-S total |
|---|---|---|---|---|---|
| Income [1] | $88,421.59 | $77,478.15 | $84,192.75 | $9,475.00 | $259,567.49 |
| Expenses: | | | | | |
| Officer salaries | 77,950.00 | 58,500.00 | 57,695.00 | 8,075.00 | 202,220.00 |
| Salaries and wages | 240.33 | 6,825.12 | 10,884.00 | 45.00 | 17,994.45 |
| Repairs | | 100.35 | 280.49 | | 380.84 |
| Rents | | 2,886.46 | 1,876.42 | | 4,762.88 |
| Taxes: | | | | | |
| Federal unemployment | 4.30 | 35.78 | 45.23 | 29.20 | 114.51 |
| Wisconsin unemployment | 94.91 | 163.92 | 197.64 | 86.22 | 542.69 |
| Narcotics [2] | | | | | 1.00 |
| Personal property | | 158.96 | 366.52 | | 525.48 |
| Social Security | 252.14 | 397.97 | 494.08 | 216.79 | 1,360.98 |
| Pension | 7,360.09 | 245.78 | 1,759.32 | 307.30 | 12,033.58 |
| | | 2,253.22 | | | |
| | | 107.87 | | | |
| Drugs and supplies [3] | | 2,213.41 | 5,519.23 | | 7,765.05 |
| Stationery and postage | | 459.81 | 738.24 | | 1,198.05 |
| Telephone | | 387.93 | 341.29 | | 729.22 |
| Laundry and cleaning | | | 693.38 | | 693.38 |
| Insurance-general | 107.00 | 464.12 | 156.63 | 106.00 | 977.75 |
| | 43.20 | 43.20 | 43.20 | 14.40 | |
| Insurance-medical and accident | 771.20 | 1,264.32 | 819.00 | 439.45 | 3,293.97 |
| Fees | 1,075.00 | 53.00 | 1,853.88 | | 4,186.88 |
| Secretary of state | ·1.25 | 1.25 | 1.25 | 1.25 | |
| Fees | 360.00 | 360.00 | 360.00 | 120.00 | |
| Miscellaneous | 7.83 | 7.83 | 38.61 | 7.82 | 62.09 |
| Miscellaneous-amortization [3] | | | | | 100.00 |
| Dues and journals | | 496.33 | 5.00 | | 501.33 |
| Total expense [4] | 88,267.25 | 77,426.63 | 84,168.41 | 9,448.43 | 259,444.13 |
| Net income per 1120-S distribution | 74.03 | 24.67 | 12.33 | 12.33 | 123.36 |

[1] The discrepancies between these figures and the income figures per the cash receipts journal have not been explained.
[2] There was no allocation shown in the workpapers for the $1 narcotics tax or for the $100 amortization of organization expense.
[3] The allocation of the Drugs and Supplies totals $32.41 less than the amount deducted on the 1120–S return.
[4] Totals reflect figures available with above unreconciled differences.

None of the expenses for salaries, wages, repairs, rents, drugs, supplies, stationery, postage, telephone, cleaning, insurance, etc., have been shown to have been incurred by the corporation, nor did petitioners act as agents of the corporation when they incurred such expenses. The corporation merely paid these expenses charging them to the account of the petitioner who incurred them.

Petitioners all reported on their respective returns for 1965 the amounts of "officers salaries" paid to them as well as their respective shares of the corporation's "Net Income per 1120-S Distribution."

The Commissioner determined deficiencies in petitioners' income taxes for 1965 reflecting his determination that petitioners were engaged in business as partners and not as employees of Pfeffer Associates. Accordingly, he determined that petitioners had received additional amounts of income during 1965 in amounts representing their respective shares of Pfeffer Associates' pension plan contributions, and payments of other expenses including the cost of insurance policies and Social Security taxes.

OPINION

The Commissioner has determined that petitioners were engaged in the practice of radiology as partners within the meaning of section 7701 of the Internal Revenue Code of 1954. The term "partnership," as defined in that section "includes a syndicate, group, pool, joint venture, or other unincorporated organization, *through or by means of which any business*, financial operation, or venture *is carried on*, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term 'partner' includes a member in such a syndicate, group, pool, joint venture, or organization." (Emphasis supplied.)

In respect to this determination it should be made clear that the question is *not* whether Pfeffer Associates, for Federal income tax purposes, should be classified and taxed as a corporation on the one hand or as a partnership on the other.[4] Rather, the issue is whether petitioners' business was actually *carried on* by the incorporated organization or whether it was carried on outside that organization. See *Commissioner* v. *Laughton*, 113 F. 2d 103 (C.A. 9, 1940), remanding an opinion of this Court.

---

[4] The Commissioner has recently announced that organizations of doctors, lawyers, and other professional people organized under State professional association acts will, generally, be treated as corporations for tax purposes. This announcement followed a decision not to apply to the Supreme Court for certiorari in the recent cases of *O'Neill* v. *United States,* 410 F. 2d 888, (C.A. 6, 1969), affirming 281 F. Supp. 359 (N.D. Ohio 1968) and *Kurzner* v. *United States,* 413 F. 2d 97 (C.A. 5, 1969), affirming 286 F. Supp. 839 (S.D. Fla. 1968), which held that a group of doctors organized under State law was classifiable as a corporation for Federal tax purposes. The Government, however, reserved the right to challenge the tax status of income earned by members of such groups in cases which reflect special circumstances not present in *O'Neill* or *Kurzner.* T.I.R. 1019, Aug. 8, 1969.

In other words, did the *corporation* "earn" the income? It is fundamental that income is taxed to the true "earner" thereof. If the income here was earned by the petitioners, the Commissioner must prevail. In the case of a corporation which provides personal services for a fee, income is "earned" by the corporation or by the person who actually performs the services, whoever has the "ultimate direction and control over the earning of * * * [the] compensation." *Richard Rubin*, 51 T.C. 251, 265-266 (1968), citing Lyon & Eustice, "Assignment of Income: Fruit and Tree as Irrigated by the P. G. Lake Case," 17 Tax L. Rev. 393 (1962). The Commissioner contends that the petitioners surrendered control over their services to the corporation in form only, while actually retaining such control, and that they were not bona fide employees of Pfeffer Associates during 1965. We agree.

Pfeffer Associates appears to have existed during 1965 as a mere set of bookkeeping entries and bank accounts. It did not enter into any arrangements to provide the service of its "employees" to any of the institutions, doctors, etc., for whom petitioners provided services. It did not own any equipment, incur any debts for rent, office or medical supplies or services or for salaries, except for the salaries of the petitioners. The only "shared" expense, i.e., the only expense which was incurred jointly by the petitioners was $45 a month for the time Ramin's Hampton office secretary devoted to maintaining records of income and expenses received and paid by Pfeffer Associates. The maintenance of these records for tax purposes appears to be the only real business activity engaged in by the corporation. Pfeffer Associates did not assign any of the petitioners to the various places of employment, as would be suggested by Article 1 of petitioners' employment agreements with Pfeffer Associates. On the contrary, Pfeffer worked 90 percent of the time at St. Francis Hospital where *he* was chief of radiology. *He* was personally obligated by contract with the hospital to provide complete radiology service. His responsibilities to the hospital appear to have been inherently personal. We doubt that Pfeffer Associates *could* (or that petitioners ever intended it to) interfere with Pfeffer's contractual obligation to the hospital. Nor, for instance, did Pfeffer Associates "assign" Ramin to his Hampton office practice, which he purchased in 1959 and where he owned all of the radiology equipment. We are not persuaded that Ramin ever intended to relinquish control over the practice which *he* had developed over a period of years. Nor was he "assigned" by Pfeffer Associates to perform services at St. Mary's Hill Hospital or Sacred Heart Sanitarium where he was chief of radiology under personal contract. It does not appear these hospitals were even aware of Ramin's association with Pfeffer Associates. Certainly the corporation had no right to assign its em-

ployees to either institution, nor can it fairly be said that either was an institution "served by the employer," as intimated by Article 1 of petitioners' employment agreements.

Nor do we infer from the mere fact that petitioners occasionally covered for each other as a matter of convenience among themselves that they had relinquished ultimate direction and control over their activities to Pfeffer Associates as their "employer." The extent of such coverage has not been shown to have been extensive, continuous, or regular. Rather it appears to have been occasional and temporary. Pfeffer Associates did not direct the petitioners to cover for each other. Rather, it appears they worked coverage out as between themselves. Incorporation added nothing to such arrangements, as petitioners were already acquainted with each other, being commonly employed by Pfeffer at St. Francis Hospital.

Nor do we think that the corporation was ever, as a practical matter, given the right to direct any of its "employees" in their professional activities. Article 1 of their employment agreements with the corporation, which purports to transfer such control to Pfeffer Associates, seems to us to have been carefully drafted to create the appearance of such control in the hands of the corporation while leaving the petitioners free, as a practical matter, to continue their separate practices just as they had prior to 1961. The only evidence of common control was that Pfeffer would indicate to an associate when he would be needed at St. Francis Hospital and the associate would have to arrange his schedule accordingly. This control was not conferred upon Pfeffer as president of Pfeffer Associates under Article 1. As a practical matter, as their employer Pfeffer had previously had such authority over his associates.

Nor do we think that Pfeffer Associates actually controlled the quality of petitioners' work, or otherwise interfered in their conduct of their several practices. Did Pfeffer ever visit the Hampton or Cleveland offices? Did he ever see any of his associates in their practices outside of their work for him? There is no evidence that he did. The record suggests that petitioners informally exchanged ideas with each other concerning their various practices to the extent they were aware of what each others' practices consisted. We do not think this informal dialogue among professionals engaged in a common specialty is unusual, nor that it constitutes evidence of employment relationship with the corporation.

While the corporation paid certain of petitioners' expenses, we see nothing more in this arrangement than the centralization of petitioners' previously separate bookkeeping. The corporation for instance did not hire the personnel at the Hampton office. *It* did not determine their salaries, or supervise them in their employments.

Ramin did. The suggestion that he did so as an agent of Pfeffer Associates simply is not supported by the facts. As a practical matter, Ramin's conduct of this office was a matter of indifference to the corporation, which served simply as a conduit for income and expense items. The same is true concerning the professional liability insurance procured by each of the petitioners and paid for by the corporation. The amounts of insurance, its cost and type of coverage were determined by each of the petitioners. They merely paid for it by checks drawn on the corporation.

All these circumstances distinguish this case from *United States* v. *Empey*, 406 F. 2d 157 (C.A. 10, 1969). *Empey* involved the question whether an incorporated professional service organization, for Federal income tax purposes, would be classified and taxed as a corporation or as a partnership. On the facts of that case, there can be no doubt that the incorporated organization, however it was classified, actually earned the income involved there. We have no doubt, on the facts of the present case, that Pfeffer Associates, the corporation, had nothing to do with the earning of the amounts of income involved here. We know of no case which has decided that two or more professionals engaged separately in their own practices can become, in respect of the income from those practices, "employees" of a corporation through the purely formal device of incorporating a set of bookkeeping sheets. That is all that has been done here. Accordingly, we uphold the Commissioner on the only issue presented for our determination.[5]

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

TANNENWALD, *J.*, concurring: I think it important that there be no misunderstanding as to the import of our decision herein and its relation to *O'Neill* v. *United States*, 410 F. 2d 888 (C.A. 6, 1969), affirming 281 F. Supp. 359 (N.D. Ohio 1968), *Kurzner* v. *United States*, 413 F. 2d 97 (C.A. 5, 1969), affirming 286 F. Supp. 839 (S.D. Fla. 1968), and *United States* v. *Empey*, 406 F. 2d 157 (C.A. 10, 1969), affirming 272 F. Supp. 851 (D. Colo. 1967). None of the cited cases held that the formation of a professional service corporation under local law ipso facto entitled it to be recognized as a separate entity for Federal income tax purposes. In each instance, the corporation involved was found not only to have been formed but actually to have been operated as a separate entity and consequently to have acquired an independent viability for tax purposes under the long-established standards enunciated by such decisions as *Moline Properties* v. *Com-*

---

[5] Petitioners have not argued that they should be taxed other than as a partnership, in the event that the tax viability of the corporation is not sustained.

*missioner*, 319 U.S. 436 (1943), *Morrissey* v. *Commissioner*, 296 U.S. 344 (1935), and *Gregory* v. *Helvering*, 293 U.S. 465 (1935).

The professional service corporation acts, enacted by the various States in recent years, removed previously existing restrictions on the capacity of certain persons to practice their professions under the corporate form. In so doing, such legislation simply placed such persons on a par with other taxpayers with respect to their freedom to adopt that form of doing business; it did not relieve the corporation of the obligation of performing some meaningful business function in order to gain recognition as a separate entity for tax purposes. *National Investors Corporation* v. *Hoey*, 144 F. 2d 466 (C.A. 2, 1944). The corporation must be given substance through the manner in which it actually operates. This was not done here. Unlike the taxpayers in *O'Neill*, *Kurzner*, and *Empey* petitioners herein simply did not put flesh on the bones of the corporate skeleton, irrespective of the question of its legal existence under local law. Within the context of the Federal income tax, the corporation never became operative in any meaningful sense. The individuals, not the corporation, continued to earn the income and separately to enjoy their own earnings.

I also note that the majority herein concludes only that the separate identity of Pfeffer Associates as a corporation should not be recognized. Petitioners having contested only the issue of such recognition, we did not consider whether the tax liability of petitioners should be posited on the existence of a de facto partnership (as respondent determined) or on the basis of separate individual liability.

RAUM, FORRESTER, FAY, FEATHERSTON, IRWIN, STERRETT, AND QUEALY, *JJ.*, agree with this concurring opinion.