BENJAMIN & ANN B. GETTLER, et al., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent * OF INTERNAL REVENUE, Respondent
Gettler v. Commissioner
Docket Nos. 5562-72, 5616-72 5619-72, 5664-72 5665-72, 5691-72 4921-73, 4922-73
United States Tax Court
T.C. Memo 1975-87; 1975 Tax Ct. Memo LEXIS 288; 34 T.C.M. (CCH) 442; T.C.M. (RIA) 750087; March 31, 1975, Filed Benjamin Gettler, pro se in docket no. 5562-72. Robert S Brown, for the petitioners. Conley G. Wilkerson, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Pursuant to respondent's motion, these eight cases were consolidated for the purpose of trial, briefing and opinion. Respondent determined deficiencies in petitioners' income taxes as follows: Calendar Year
or Taxable Year Petitioners
Ending
Deficiencies
Benjamin Gettler
1968
$ 9,490.33
and Ann B. Gettler
J. W. Brown and
1968
21,889.46
Shirley Brown
1969
39,112.00
John R. Taylor and
1968
1,016.50
Mary E. Taylor
1969
5,106.16
David E. Taylor and
1968
1,016.16
Deborah M. Taylor
1969
5,295.04
Robert S Brown and
1968
1,814.98
Phyllis Brown
1969
1,386.00
Brown, Gettler and
January 31, 1968
27,184.00
Brown, Inc.
January 31, 1969
15,588.00
*290 Concessions having been made by the parties, the following issues are presented: 1. Whether the income of the law partnership of Brown & Gettler for the taxable years ending January 31, 1968 and 1969 should be increased by $30,448 and $12,701.88, respectively, as a result of reallocating to the partnership the net income from fees of the corporation Brown, Gettler & Brown, Inc. for its taxable years ended January 31, 1968 and 1969. 2. Whether the corporation is subject to personal holding company tax during the taxable years ended January 31, 1968 and 1969. 3. Whether the corporation is entitled to deduct as an ordinary and necessary business expense, for its taxable years ended January 31, 1968 and 1969, $10,594 and $7,397, respectively, representing medical expense payments made on behalf of its officer-stockholders under its medical expense reimbursement plan. 4. What were the fair market values of the land and building components respectively of the Mitchell Avenue Property on July 1, 1968? 5. Whether renting of the Villa Romar in Acapulco, Mexico, constituted a trade or business, or whether the Villa was property held for the production of income, thereby entitling *291 petitioners J.W. and Shirley Brown to deduct losses incurred in connection with the Villa during 1968 and 1969. 6. Whether petitioners Robert S and Phyllis Brown are entitled to claim a theft loss of $1,420, or any lesser amount, for 1968. For the years in question, all individual petitioners lived in Cincinnati, Ohio and filed Federal joint income tax returns with the District Director in Cincinnati. All were residents of Cincinnati, Ohio, when they filed their petitions. During the years in issue and at the time it filed its petition in this case, Brown, Gettler & Brown, Inc. was an Ohio corporation with its principal office in Cincinnati. It filed its Federal corporate income tax return with the District Director in Cincinnati. During the years in issue Brown & Gettler was a law partnership located in Cincinnati, Ohio, which filed its Federal income tax returns with the District Director in Cincinnati. FINDINGS OF FACT Some of the facts have been stipulated and are accordingly found. I. Reallocation of Income.
Petitioner J. W. Brown has been an attorney since 1936 specializing in representing labor unions. In 1953 J. W. Brown and petitioner Benjamin Gettler, also *292 an attorney, formed a partnership to engage in the practice of law. Commencing with the fiscal year ending January 31, 1968, petitioner Robert S Brown, son of J. W. Brown, became a partner in the law partnership. In 1962, J. W. Brown, Benjamin Gettler and Ray R. Brown (who apparently is not related to J. W. Brown or Robert S Brown) formed a corporation, Brown, Gettler & Brown, Inc., to handle work in the labor relations field for management. The first reason alleged for forming the corporation was to permit the representation of employers in labor matters. The partners believed that if this type of work were undertaken by the law partnership, it would jeopardize the partnership's relations with labor union clients. Labor unions generally will not employ anyone with a reputation for representing management in labor disputes. In fact, when the law partnership represented Cincinnati Transit Company (a client for whom the partnership handled all kinds of legal work and not just labor relations, and in which the partners had a financial interest) in a labor dispute, the union involved in the dispute went to other unions who were clients of the law partnership and appealed to them to cease *293 hiring the law partnership, and derogatory statements were made about the law partnership before the Central Labor Council of Cincinnati. The formation of the corporation and the referral of representation of management in labor matters to the corporation was expected to lessen the risk that the law partnership would lose its union clients. The second reason for forming the corporation was that Ray R. Brown, one of the corporation's shareholders and employees, was not a lawyer and therefore not eligible to be a partner in the law partnership. Since the corporation was formed, its sole activity, other than investing, has been to represent management in those aspects of labor relations that do not necessarily require bar membership, namely, bargaining, arbitration, and representation before the National Labor Relations Board. Prior to and throughout the period of the corporation's existence, the law partnership engaged in extensive labor relations work, including arbitration and negotiation of labor disputes and contracts on behalf of labor unions and other employee organizations. In three instances, however, the partnership represented management in labor matters: (1) the partnership *294 has represented Coney Island, a company which J. W. Brown individually had represented since 1938 when he was recommended to the client by a labor union; (2) on several occasions in 1967 the partnership represented Cincinnati Transit Company in labor relations matters; both J. W. Brown and Mr. Gettler had direct financial interest in the Cincinnati Transit Company, and they handled all of its legal affairs; and (3) in 1967 the partnership represented Ohio Bus Lines Company, a subsidiary of Cincinnati Transit Company, with respect to certain labor relations work. These three instances were the only occasions on which the partnership represented management in a labor matter from 1953 through 1969. The corporation was located at the same offices as the partnership. There was no indication on the door to the partnership offices that the corporation shared its offices. The corporation did not have a separate telephone listing. When the corporation performed labor relations work for management, it did so in the partnership offices with the aid of partnership secretarial employees and other partnership facilities. The corporation on May 15, 1962 issued 100 shares of common stock in exchange *295 for $500. J. W. Brown owned 55 shares, Benjamin Gettler owned 25 and Ray R. Brown owned 20. [1]The corporation's minute book shows that there has been at all times full compliance with corporate formalities. For the calendar years 1963 through 1967, the corporation annually paid dividends of 10 cents per share on its common stock. For the calendar years 1968 through 1971, the corporation paid annual dividends of twenty-five cents per share. The corporation paid the following salaries to its shareholder-officers for its fiscal years ended January 31, 1968 and 1969: Employee
Fiscal 1968
Fiscal 1969
J. W. Brown
$3,400
$3,629
Benjamin Gettler
4,000
6,659
Robert S Brown
0
5,808
The corporation's gross and net income for fiscal years 1968 and 1969 was as follows: Fiscal 1968
Fiscal 1969
Income
Fees
$45,000
$33,000
Interest
113
2,362
Dividends
4,874
6,082
Gross Income
$49,987
$41,444
Expenses
(25,565)
(29,182)
Net Income
$24,422
$12,262
*296 At all times separate books and records for the partnership and the corporation were maintained by Mildred Kampman, an employee of the partnership. The funds of the partnership and the corporation were maintained in separate accounts. The corporation and the partnership used separate letterhead stationery throughout the period involved herein. The partnership billed some clients on the basis of a retainer, some on a contingency basis, and some on a basis varying with the legal responsibilities assumed, results obtained and importance of the matter. The corporation billed only on an hourly rate, varying according to the type of work involved. The following schedule shows the sources of the corporation's total gross fees for the fiscal years ended January 31, 1968 and 1969: Client
Fiscal 1968
Fiscal 1969
Cincinnati Transit Co.
$16,500
$18,000
Vulcan Corp.
28,000
15,000
Welded Wire
500
0
Total
$45,000
$33,000 These three entitles were the corporation's only clients in these two fiscal years. The work for Cincinnati Transit Company was performed by J. W. Brown, Benjamin Gettler and, to some extent, Jonas Katz, an independent attorney who handled occasional *297 work for both the partnership and the corporation. The work for Vulcan Corporation was performed primarily by Jonas Katz and Benjamin Gettler, and, to a lesser extent, by J. W. Brown. The services for Welded Wire were performed by Benjamin Gettler. During the calendar years 1967 and 1968, Vulcan Corporation, like Cincinnati Transit Company, was a client of the partnership as well. The partnership received a total of $94,573 from Vulcan for services rendered during the years in issue. None of these legal services were for labor relations work. During the taxable years in issue the corporation paid the partnership $720 annually for rent and for services and facilities provided it by the partnership. It made no other payments to the partnership. II. Personal Holding Company Tax.
None of the clients of the corporation had the right to designate by name or description the employee who would perform services for the client. J. W. Brown and Benjamin Gettler determined who would perform services for the clients. Besides $45,000 in fees earned in fiscal 1968, and $33,000 in fiscal 1969, the only other income of the corporation consisted of dividends and interest. III. Medical *298 Expense Reimbursement Plan.
The corporation adopted a comprehensive and detailed medical expense reimbursement plan on March 23, 1966. As originally drawn it covered only J. W. Brown and Benjamin Gettler. On December 5, 1967, it was amended to include Robert S Brown. Pursuant to this medical expense reimbursement plan, during the fiscal year ended January 31, 1968 the corporation paid $9,572 to J. W. Brown and $1,022 to Benjamin Gettler. For the fiscal year ending January 31, 1969 the corporation paid $4,621 to J. W. Brown, $1,775 to Benjamin Gettler and $1,001 to Robert S Brown. IV. Mitchell Avenue Property.
On or about May 30, 1968, J. W. Brown, David E. Taylor and John R. Taylor purchased real property at 266 West Mitchell Avenue ("Mitchell Avenue Property"), Cincinnati, Ohio, for $250,000. They took possession about July 1, 1968. J. W. Brown acquired a 50 percent interest, and David E. Taylor and John R. Taylor each acquired a 25 percent interest in the property. The Mitchell Avenue Property is located in an industrial and commercial area just west of the Interstate 75 and Mitchell Avenue interchange. The parcel of land is irregular in shape, with a 220 foot *299 frontage, an irregular depth of about 1,398 feet, and an area of 6.55 acres. The site is level with Mitchell Avenue at the front, but drops off at the back into a low-lying area which is presently marshy and unusable. The site has all utilities as well as railroad facilities. The buildings on the Mitchell Avenue property on July 1, 1968, consisted of the following: (i) A two-story brick office building, containing 10,004 square feet, with air conditioning and heating. It had adequate plumbing facilities and sprinklers. The building was constructed in 1890 and remodeled in 1942. It appeared physically sound and was in reasonably good condition. (ii) A one-story brick warehouse building, containing 68,064 square feet, with sprinklers, heaters and adequate plumbing facilities. The west side of the building had several large doors leading to loading docks and a railroad siding. The east side had dock facilities for truck shipping. The warehouse also contained a built-in cold storage area of approximately 6,000 square feet. The building was 65 to 70 years old, cut up in area, and of various types of construction of various ages and in various conditions. (iii) A one-story brick *300 garage and motor repair building, containing 2,196 square feet, constructed in 1901 and later remodeled. It was heated, had a sprinkler system and water outlets. It was of average construction and in fairly good condition. (iv) A one-story yard office building, containing 1,680 square feet, with large dock area and incinerator area. This building was built in 1942 of concrete block construction. It was heated but had no plumbing. The dock area had a large metal canopy. The building was in fairly good condition. Associated with the buildings were underground fuel tanks, a railroad siding, paving and fences. The assessed valuations of the land and buildings on the Hamilton County tax list were as follows: Year
Land
Buildings
Total
1968
$ 54,980
$80,740
$135,720
1969
101,200
28,130
129,330
1971
28,600
71,400
100,000 The 1971 value represents the results of a reappraisal by the Supervisor of Industrial Real Estate, Mr. Klein. The assessed value was at 40% of cost. For the years 1969 through 1972, the rental income, operating expenses, and net operating profit of the property were as follows: Net
Rental
Operating [2]
Operating Year
Income
Expenses
Profit
1969
$55,149
$38,098
$17,051
1970
59,852
19,916
39,936
1971
53,872
36,092
17,780
1972
49,879
17,048
32,831
*301 The annual rent per square foot was $.77 in 1969, $1.03 in 1970, $.91 in 1971, and $.80 in 1972. As of July 1, 1968, the fair market value of the land was $125,000 and of the buildings was $125,000, or a total of $250,000. V. Villa Romar.
In 1960 J. W. Brown purchased a residence in Acapulco, Mexico, including furnishings and fixtures, for $21,000. This residence, known as Villa Romar (sometimes "Villa") contains four bedrooms, five baths, two separate rooms with a bath for the permanent employees, a swimming pool and entertainment facilities. Every year J. W. Brown reserved the Villa for certain periods for his personal use, namely, from just before Christmas through January 15 and in August. The rest of the year the Villa was offered for rent. In addition, J. W. Brown set aside a week or two for friends in the summer and in November. The property was always available for his personal use when it was not rented. The peak tourist season in Acapulco is from Christmas through the month of April. For each of the years 1961 through 1969 J. W. and Shirley Brown reported the net gain *302 or loss on the rental of the Villa in their Federal income tax returns. In calculating the net gain or loss they took into account their personal use of the Villa. In 1962 and 1967 J. W. Brown made a profit of $133.92 and $86.00, respectively. In the other years, the following losses were reported: Year
Loss
1961
$2,352.62
1963
$4,690.04
1964
$5,360.24
1965
$4,316.84
1966
$3,980.00
1968
$2,630.00
1969
$2,142.00
J. W. Brown was personally involved in the rental of Villa Romar. Either he or his secretary handled all correspondence relating to the Villa, he determined the rental rates, and he dealt directly with all the Villa's lessees. He drafted and placed one-inch advertisements for the property in the Wall Street Journal in 1963, 1965 and 1966; these advertisements appeared once or twice in each such year. The Villa Romar was not listed for rent with a rental agent in Acapulco nor with a travel agency in Cincinnati. Advertising the availability of the Villa Romar for rent was done primarily by word of mouth from people who had rented the property. Also, an acquaintance of J. W. Brown's in Boston referred interested parties. J. W. Brown also prepared *303 a brochure with photographs which he mailed to potential lessees of the Villa. Between 1967 and 1969, J. W. Brown received 47 letters of inquiry concerning Villa Romar, and he sent out 57 letters. During 1968 the Villa Romar was rented to four different individuals for the following periods: (i) January 31 to February 10; (ii) February 10 to February 18; (iii) April 15 to April 30; and (iv) September 5 to September 8. During 1969 the Villa Romar was rented to four different individuals as follows: (i) January 18 to January 25; (ii) January 25 to February 2; (iii) February 21 to March 8; and (iv) April 7 to April 22. J. W. Brown, who has dealt successfully and extensively in real estate all of his adult life, valued the property at $50,000 or $60,000 when he purchased it in 1960 and he believed it to be worth in excess of $100,000 in 1973. He has never offered the Villa for sale. Villa Romar was not held primarily for the production of income during 1968 and 1969. The limited rental activity did not constitute a trade or business. The property was held primarily for recreation purposes during the years in issue. VI. Theft Loss Deduction.
Robert S Brown and his wife, *304 Phyllis, lived in an apartment at 60 East 12th Street, New York City, while he was studying for a Master's Degree in Taxation from the New York University Law School. On January 23, 1968, upon returning to his apartment, Robert S Brown discovered that various items of personal property had been stolen. The theft and description of the stolen items was reported by petitioners to the New York City Police Department. The stolen items consisted of the following: silver quarters and silver certificates with face amount of $45; 1/4 carat diamond tie pin; man's Omega self-winding wrist watch; a pair of pearl and diamond earrings set in platinum; cultured pearl necklace, 25 inches long with uniform 3/8 inch pearls; Mexican gold coin earrings; diamond ring consisting of one main diamond circled by 10 small diamonds, set in platinum; 2 inch square gold flower pin set with pearls, sapphires and rubies; white gold chain with pearl and diamond pendant; gold charm replica of Plaza Hotel. Robert S Brown bought the silver quarters and silver certificates for $60 and the pair of pearl and diamond earrings for $200. Phyllis Brown bought the Mexican gold coin earrings for $40. The fair market value of *305 these items when stolen exceeded their cost. Petitioners do not have cost records for those stolen items which were received as gifts from others. The donor of one of the items, a diamond ring, was deceased at the time of the theft. The other gift items were received under circumstances which made the petitioners feel that any request for cost information would be discourteous. Hence, none was made. In claiming a theft deduction for 1968, Robert S and Phyllis Brown valued the stolen items at their estimate of the lower of cost or fair market value at the time of the theft. This sum was calculated to be $1,520. Respondent has disallowed this deduction in its entirety. OPINION I. Reallocation of Income.
A. Under section 61.[3]
Respondent contends that the fee income (as opposed to the investment income) reported by the corporation for its taxable years ended January 31, 1968 and 1969 was earned by the law partnership, and is therefore taxable to the partnership for its taxable years ended January 31, 1968 and 1969, and not to the corporation. Petitioners *306 [4] claim that the corporation is a viable business entity engaged in substantial business activity other than avoiding tax and is not a sham, and as such itself earned the net fee income reported by it on its income tax returns for its taxable years 1968 and 1969, and we agree. J. W. Brown, Benjamin Gettler and Ray R. Brown formed the corporation in 1962 to handle work in the labor relations field for management. The work consisted of collective bargaining, arbitration, representation of clients before the National Labor Relations Board, and other labor matters in which the client could be represented either by a lawyer or non-lawyer. The corporation, unlike the partnership, did not consider itself as engaged in the practice of law. J. W. Brown and Benjamin Gettler are lawyers and had previously formed a law partnership which principally engaged in representing labor unions, but Ray R. Brown was not a lawyer. Labor unions generally will not engage attorneys or law firms who represent management in labor relations matters. One reason for creating the corporation *307 was allegedly to form an entity separate and apart from the law partnership which could engage in the representation of management in labor relations matters. A second reason was to permit Ray R. Brown to participate in the net income of the pro-management labor work. Ray R. Brown is not a lawyer and therefore could not ethically be permitted to participate in the partnership's profits. He was not an employee or a partner in the partnership. Prior to January 20, 1966 he was both a shareholder and an employee of the corporation. Since its formation in 1953, the law partnership has limited its labor relations work exclusively to labor union clients with three exceptions: (1) it represented an employer, referred to it by one of its union clients, in labor negotiations; (2) it represented two clients (Cincinnati Transit Co. and its subsidiary, Ohio Bus Lines Company) in which J. W. Brown and Benjamin Gettler have a financial interest and who are general clients of the law firm on a retainer basis, in their labor relations work. This latter representation jeopardized the law firm's continued relationship with its labor union clients. Therefore the corporation was formed in 1962. After *308 its formation the corporation represented three clients in labor matters, namely, Cincinnati Transit Co., Vulcan Corp., and Welded Wire. These were the corporation's only clients. The partnership also represented Cincinnati Transit Co. and Vulcan Corp., the two principal clients. The corporation's only other activity was managing its investments. The employees of the corporation during the years in issue were J. W. Brown, Benjamin Gettler, Robert S Brown and Jonas Katz. All of them also performed services for the partnership. The corporation was properly incorporated and operated. It observed all the formalities of corporate status. It maintained separate books of accounts and records. Its funds were kept in separate accounts. It had its own letterhead stationery. For the calendar years 1963 through 1967 it paid annual dividends of 10 cents a share, and from 1968 through 1971 of 25 cents per share. The corporation operated out of the offices of the partnership. It used partnership secretarial and accounting help. The corporation paid the partnership $720 a year for rent and for services and facilities of the partnership used by it. Both payments were reasonable in relationship *309 to the rent and for services and facilities provided by the partnership. The corporation had substantial assets and liabilities, and in all respects carried on an active business. Respondent does not maintain that the corporation is a sham, but does assert that the fragmentation of the law business here involved is "unrealistic and of no avail for tax purposes for it clearly undercuts the principle of taxing income on a graduated basis." Respondent also asserts that "the alleged reason for forming the corporation is spurious as well as the contention that it earned the income in question." Respondent contends that the real reason for forming the corporation was to reduce the partners' taxable income. It has long been settled that taxpayers are free to arrange their business in such a way as to minimize taxes. Commissioner v. First Security Bank of Utah, N.A.,405 U.S. 394, 399 fn. 4 (1972), affirming 436 F. 2d 1192 (C.A. 10, 1971), which reversed and remanded a Memorandum Opinion of this Court; Friedlander Corp. v. Commissioner,o 216 F. 2d 757 *310 (C.A. 5, 1954), affirming in part and reversing and remanding in part 19 T.C. 1197 (1953), on remand 25 T.C. 70 (1955); V. H. Monette & Co.,45 T.C. 15, 32 (1965), affirmed per curiam374 F. 2d 116 (C.A. 4, 1967); Polak's Frutal Works, Inc.,21 T.C. 953, 973 (1954); Palm Beach Aero Corporation,17 T.C. 1169, 1176 (1952); Estate of Julius I. Byrne,16 T.C. 1234, 1244 (1951); Seminole Flavor Co.,4 T.C. 1215, 1235 (1945). But respondent argues that the law partnership had control of the flow of income and therefore is the entity to which the income should be taxed, citing Harrison v. Schaffner, 312 U.S. 579 (1941) and Lucas v. Earl,281 U.S. 111 (1930). In those cases the Court found that the assignor of the income had either actually performed the services that earned the income or owned the property which produced the income. While the law partnership maintained a client-attorney relationship with some of the corporation's clients, it was not that relationship that produced the corporation's income, but rather *311 the services performed by the employees of the corporation that did so. "[A] taxpayer's right to designate the party to earn income does not constitute such control over the income that it should be imputed to him, and that designation does not constitute anticipatory assignment of income. Robert P. Crowley,34 T.C. 333 (1960)." Nat Harrison Associates, Inc.,42 T.C. 601, 620 (1964). Moreover, a taxpayer may legitimately split up his business if there is a business purpose in doing so, and if each portion of the business is operated as a separate entity. Sanford H. Hartman, 43 T.C. 105, 117-118 (1964);Palm Beach Aero Corporation,supra;Grenada Industries, Inc.,17 T.C. 231 (1951), affirmed 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819 (1953); Estate of Julius I. Byrne,supra at 1243-1244; Seminole Flavor Co.,supra.
Here petitioners allege two business reasons for establishing the corporation, namely, to preserve the relationship of the law partnership *312 with its labor union clients, the source of a majority of the fees earned by the law partnership, and to permit Ray R. Brown, a non-lawyer, to participate in the corporate fees. We seriously doubt that a labor union, dissatisfied because its lawyers are representing management, would be measurably mollified because they did so through a professional corporation rather than a partnership. Our skepticism is not reduced by the fact that the partnership was also servicing the corporation's two principal clients. However, the second reason appears to have provided sufficient justification for forming the corporation. Once the corporation had been formed for good reasons, we see no reason in tax law why it could not be continued even after Ray R. Brown's departure. The corporation and the law partnership were operated as distinct and separate entities. It does not make any difference that the same individuals performed services for both entities nor that both entities operated out of the same premises. Grenada Industries, Inc.,supra, at 255-256. Respondent relies heavily on Jerome J. Roubik,53 T.C. 365 (1969), in contending that all the fee income of the corporation *313 should be taxed to the partnership, but we find that case clearly distinguishable on the facts. In Roubik four radiologists, who had previously engaged separately in the practice of radiology, formed a professional corporation which was validly incorporated under state law. However, the Court found that after incorporation the doctors continued their separate practices with the exception of centralized bookkeeping. As stated in the concurring opinion, they "simply did not put flesh on the bones of the corporate skeleton, irrespective of the question of its legal existence under local law." 53 T.C. at 382. In the case at issue we have a valid corporation both for general legal and tax purposes, and hold that the corporation through its employees earned the fee income which is properly taxable to it. Finally, the record does not indicate, contrary to respondent's contentions, that the division of the labor relations business between the law partnership and the corporation resulted in any significant tax advantage to the petitioners. B. Under section 482.
Respondent further claims that it may and has properly reallocated the corporation's net fee income for *314 its taxable years 1968 and 1969 to the law partnership under section 482. Petitioners assert that respondent's section 482 reallocation is arbitrary and unreasonable and an abuse of his discretion. Again we agree with petitioners. Section 482 authorizes the respondent to distribute, apportion or allocate gross income, deductions, credits, or allowances between or among organizations owned or controlled by the same interest if he determines that such is necessary in order to prevent evasion of taxes or clearly to reflect the income of the organizations. In certain circumstances respondent may allocate net income under section 482 as a short cut to allocating gross income and deductions. Marc's Big Boy-Prospect, Inc.,52 T.C. 1073 (1969), affirmed 452 F. 2d 137 (C.A. 7, 1971); Hamburgers York Road, Inc.,41 T.C. 821 (1964); Ballentine Motor Co., 39 T.C. 348 (1962), affirmed 321 F. 2d 796 (C.A. 4, 1963). Where respondent *315 has applied section 482, the burden is on petitioners to show that respondent's reallocation was arbitrary and unreasonable. Marc's Big Boy-Prospect, Inc.,supra,52 T.C. at 1095; Bush Hog Manufacturing Co.,42 T.C. 713, 724 (1964); Grenada Industries, Inc.,17 T.C. 231, 255 (1951), affirmed 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819 (1953). The standard to be applied is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Section 1.482-1(c), Income Tax Regs.
The parties agree that the law partnership and the corporation are controlled by the same interests. The question is whether respondent's reallocation herein is arbitrary and unreasonable, and we conclude that it is. Despite the numerous intertwining relationships, the employees of the corporation carried out their distinct function in the same way that strangers would have. The facts that capital was not a material contributory factor in earning the fee income, that the corporation had no employees who were not also partners or employees of the law partnership, and that *316 it operated out of the same premises as the partnership, do not mean that the law partnership earned the corporation's fee income. Grenada Industries, Inc.,supra,17 T.C. at 255-256. The respondent does not contend that the sum paid by the corporation to the partnership for rent and use of partnership services and facilities was other than arm's length. Where as here the corporation carried on its own autonomous business, its income will not be reallocated to a related business which did not earn it. Your Host, Inc.,58 T.C. 10 (1972), affirmed 489 F. 2d 957 (C.A. 2, 1973), certiorari denied U.S. (Oct. 15, 1974); V. H. Monette & Co.,45 T.C. 15 (1965), affirmed on other issue 374 F. 2d 116 (C.A. 4, 1967); Bush Hog Manufacturing, Co.,supra.Cf. Marc's Big Boy-Prospect, Inc.,supra;Hamburgers York Road, Inc.,supra.As previously noted, the mere power to refer business to the corporation does not convert the corporation's earned income into the law partnership's earned income. It is the actual shifting of income earned by one business to another which section 482 is designed to attack. *317 We find no such shifted income here. II. Personal Holding Company Tax.
Respondent contends that the corporation's fee income is allocable to the law partnership, and that its remaining income, being dividends and interest, is clearly personal holding company income. However, respondent concedes that if the Court holds that the fee income is properly taxable to the corporation (and we have so held), then the corporation's personal holding company income would not constitute at least 60 percent of its adjusted gross income and the corporation would not constitute a personal holding company as defined in section 542. Respondent having conceded the issue, we hold for petitioner-corporation. III. Medical Expense Reimbursement Plan.
Respondent argues that petitioners J. W. Brown, Benjamin Gettler and Robert S Brown were not employees of the corporation but in actuality were working on behalf of the law partnership, and therefore medical expenses paid on their behalf as employees of the corporation are not deductible as ordinary and necessary business expenses of the corporation but were dividends to the petitioners. However, we have held that the petitioners were indeed employees *318 of the corporation and caused the corporation to earn the fee income that it reported for the years in issue. We further hold that the medical expenses paid by the corporation on behalf of these employees are deductible by the corporation as an ordinary and necessary business expense. IV. Mitchell Avenue Property.
On or about May 30, 1968, petitioners J. W. Brown, John R. Taylor and David E. Taylor, purchased improved real property at 266 West Mitchell Avenue, Cincinnati, for $250,000. Petitioners allocated 70 percent of the total purchase price or $175,000 to depreciable improvements. [5] In the statutory notice of deficiency respondent determined that the purchase price should be allocated $36,250 to buildings and improvements and $213,750 to land. The question presented is what are the relative values of the land and the improvements comprising the Mitchell Avenue property at the time of purchase. *319 The parties presented the valuations of four experts that allocated anywhere from 21 percent to 74 percent of the total value of the property to the depreciable assets. Respondent's expert, Mr. Spilker allocated only 21 percent of the value to the depreciable assets. Mr. Spilker's familiarity with the property was limited. In his appraisal he described the main buildings as being used presently as an office and warehouse operation. On cross examination, however, he admitted that he did not really know the present use of the building and that it may well have been, as petitioners maintain, in part devoted to the manufacturing of jet engines parts. Mr. Spilker also testified that the refrigerated space in the property was not used for several years after the property was purchased, whereas the parties have stipulated that the refrigerated space was rented for most of 1969 to ARA for $3.99 per square foot. Mr. Spilker stated that the 4700 square feet of refrigerated space under lease was "a very small portion of the building" and that he was unfamiliar with its cost of construction. His appraisal expressly excluded the value of this space. However, during the four years 1969 through *320 1972, when the gross annual rent of the property averaged $54,284, the average annual rental from the refrigerated space was $17,271.75, or 32 percent of the gross annual rent received on the property. In applying the cost approach to valuing the main buildings, Mr. Spilker applied a per square foot construction cost of $8.50 to the total square footage of the buildings. At trial, however, he was unable to break down this square foot construction cost between the various buildings (office building, warehouse, repair garage and yard office) on the Mitchell Avenue Property. When his figures were questioned, he maintained that the cost approach, which was the only method he used separately to value the land and building, was not in his opinion a fair approach to the value of the property. Respondent's only other witness in connection with the valuation of the Mitchell Avenue Property was the examining agent, Barbara K. Sadler. To the extent her testimony indicates that the roof was in a condition requiring other than ordinary repair and maintenance expenditures for the continued operation of the building, it contradicts the parties' stipulation. Petitioners' expert witnesses appraised *321 the value of the buildings at percentages ranging from 74 percent to 66 percent of the total value of the property. Of these various valuations, petitioners urge that the appraisal of Mr. Klein should be accepted. Mr. Klein formed his views not in anticipation of litigation but in the ordinary course of his business. Cf. Palmer v. Hoffman,318 U.S. 109 (1943). Mr. Klein is the Supervisor of Industrial Real Estate in Hamilton County. He made his appraisal at the behest of the County Board of [Tax] Revision which was conducting a hearing on petitioners' complaint seeking a reduction in the property tax value of the land. He concluded that of the total value 71 percent was attributable to the improvements, and his appraisal was accepted for county property tax purposes. Petitioners also introduced the valuations of two other experts. Mr. MacConnell presented two appraisals: one, as of February 1965, valued the buildings at 70 percent of total value; the other, as of October 1973, valued the buildings at 67 percent of total value. Mr. Hanish appraised the buildings, as of November 1973, at 74 percent of total value. In their valuations Messrs. MacConnell and *322 Hanish used "comparable sales" of land which respondent contends are in no way comparable. [6] Messrs. MacConnell and Hanish also made use of net annual income figures in employing the economic approach to valuation. Respondent contends the net annual income figures used by them were distorted, first because they used the period 1967 through 1972 when the occupancy rate was at its peak, in part because 58 percent of the space was occupied by the Taylors (petitioners herein) and could not have been rented to the general public, and second because the rental figures ignored the excessive expenditures for repairs and maintenance needed to produce that rental income. We have carefully considered all the appraisals and the testimony, and recognizing that valuation is an inexact science, and taking into consideration the widely varying opinions of the experts, we conclude that 50 percent of the total value or $125,000 is attributable to the depreciable assets and 50 percent to the land. V. Villa Romar.
Petitioners J.W. and Shirley Brown deducted expenses and depreciation in excess *323 of rentals incurred in 1968 and 1969 in connection with the Villa Romar, a furnished house in Acapulco, Mexico, owned by petitioners. Respondent disallowed the deductions on the grounds that the Villa constituted a personal vacation home, and we agree. Petitioners purchased the Villa in 1960 for $21,000. They deducted $2,630 and $2,142 in 1968 and 1969, respectively, as net losses incurred in connection with the maintenance and operation of the Villa. Petitioners first claim that the Villa was held for rental, and therefore constituted a trade or business. The holding of a single property may constitute a trade or business. Anders I. Lagreide,23 T.C. 508, 511-512 (1954). They also claim they held it for the production of income. Property held for rental is property held for the production of income within the meaning of section 212. William C. Horrmann, 17 T.C. 903, 907-908 (1951). "In determining whether the holding of property for rental is a trade or business *324 within the meaning of section 162, or is a holding of property for the production of income within the meaning of section 212, the intention of the taxpayers as to the use of the property is of paramount importance. * * * If the predominant purpose and use of the property was for recreation, a hobby, or some other nonprofit motive, rather than to derive income, they are not entitled to the deductions claimed. * * * While the absence of a profit is not necessarily determinative, the operation must be of such a nature that in good faith, the taxpayers could expect a profit." Joseph W. Johnson, Jr.,59 T.C. 791, 814 (1973), affirmed 495 F. 2d 1079 (C.A. 6, 1974). In determining whether petitioners' primary purpose was to make a profit, no single fact is controlling, but greater weight must be given to objective facts than to petitioners' mere expression of intent. Joseph W. Johnson, Jr.,supra, at 815. Petitioners contend their primary purpose in holding the Villa Romar during 1968 and 1969 was to obtain rental income. To support this contention, petitioner J. W. Brown testified that such was his intent. In addition he kept meticulous business *325 records, not only of his income and expenses from the Villa, but also of all his correspondence in connection with efforts to rent it. The expenses involved were not lavish, and no expenses were charged for the periods when petitioners or their family and friends occupied the Villa. On the other hand, petitioners reserved the Villa for their personal use from before Christmas through January 15 (a peak tourist season) and in August. The property was available for their use when not rented, which was a majority of the year. During 1968 the property was rented to four different individuals for a total of 36 days, and during 1969 to four different persons for 47 days. The rentals were $3,719 and $4,605 for 1968 and 1969, respectively, and the expenses were $7,337 and $7,797. The property was not listed with a rental agent in Acapulco or with any travel agency in Cincinnati (where petitioners live). Advertising the Villa for rent was accomplished primarily by word of mouth of prior lessees. In 1963, 1965 and 1966 petitioners had run one-inch ads once or twice a year in The Wall Street Journal.Petitioners also prepared a brochure with photographs, but this was sent only to those *326 who made inquiry. We do not find petitioners' rental efforts consistent with a good faith motive to make a profit. See Carkhuff v. Commissioner,425 F. 2d 1400 (C.A. 6, 1970), affirming a Memorandum Opinion of this Court. Considering all the facts of record, we conclude that the property was held primarily for petitioners' vacation home, and not primarily for profit. Petitioners also contend that they purchased the Villa to hold for appreciation with intent to sell it at a profit. J. W. Brown had extensive experience in real estate and at trial he estimated that the Villa had already appreciated to a value of about $100,000 (he had purchased it for $21,000 in 1960). At no time prior to trial had the Villa been offered for sale. We do not find that the property was held for investment, a prerequisite to concluding that expenses incurred in maintaining it while it appreciates are deductible. Frank A. Newcombe,54 T.C. 1298 (1970). Rather we conclude that the primary purpose in both acquiring the house and holding on to it was to use it as a vacation home. VI. Theft Loss.
On their 1968 return petitioners Robert S and Phyllis Brown claimed *327 a deduction for items stolen from them in New York City. For those items received as gifts, where the donors' bases were unknown, they claimed as a loss an amount equal to their estimated fair market at time of theft. In those cases where the items were purchased, they deducted an amount equal to cost, assuming fair market exceeded cost. The amount of loss to be taken into account for purposes of section 165(a), where property has been stolen, is the lesser of either fair market value at the time of loss or the adjusted basis for determining loss from the sale of the property, as prescribed in Treasury Regulations section 1.1011-1. Sections 1.165-7(b) and 1.165-8(c), Income Tax Regs.Under Treasury Regulations section 1.1011-1, the basis of the property is cost, except in the case of property acquired by gift, in which case the basis is either the donor's basis or fair market value at the time of the gift, whichever is lower. Section 1.1015-1, Income Tax Regs.
*328 The amount of the allowable theft loss to petitioners is thus limited to the lesser of cost basis, donor's basis or fair market value. Respondent contends petitioners have completely failed to establish the amount of the allowable loss of any item. Petitioners, recognizing that they lack precise information of the bases of many stolen items and have only estimated the fair market values of all items as of the date of the theft, ask the Court to make its determination under the rule of Cohan v. Commissioner,39 F. 2d 540 (C.A. 2, 1930), modifying in part and remanding in part 11 B.T.A. 743 (1928), where it was announced that a court can make its own determination in matters such as this, "bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." 39 F. 2d at 544. Section 1015(a) provides in part: * * * If the facts necessary to determine the basis in the hands of the donor or the last preceding owner are unknown to the donee, the Secretary or his delegate shall, if possible, obtain such facts from such donor *329 or last preceding owner, or any other person cognizant thereof. If the Secretary or his delegate finds it impossible to obtain such facts, the basis in the hands of such donor or last preceding owner shall be the fair market value of such property as found by the Secretary or his delegate as of the date or approximate date at which, according to the best information that the Secretary or his delegate is able to obtain, such property was acquired by such donor or last preceding owner. Here, however, the record discloses no indication that respondent attempted to discharge his statutory duty. On the contrary, respondent simply disallowed any loss as a result of the theft. In the absence of reasonable findings by respondent of both the time of the donor's acquisition and the value of the property at that time, the Sixth Circuit held that respondent's determination of gain was not sustainable. Caldwell & Co. v. Commissioner,234 F. 2d 660 (C.A. 6, 1956), reversing 24 T.C. 597(1955). Cf.Interlochen Co. v. Commissioner,232 F. 2d 873 (C.A. 4, 1956), affirming 24 T.C. 1000 (1955). Neither in his petition, at trial, *330 or on brief, however, did petitioner point to respondent's failure to make any determinations under section 1015(a). Regardless of whether respondent's failure in this regard could be affirmatively used by a taxpayer to establish a claimed deduction, as distinguished from defeating a proposed determination of gain, a matter which we need not here decide, it would be unfair to respondent at this point to make a determination based upon such failure. [7] Accordingly, since petitioner has established a basis for loss only as to the purchased items (silver quarters and silver certificates, $60; pair of pearl and diamond earrings, $200; Mexican gold coin earrings, $40), no loss has been proven by petitioners with respect to the gift items, and none is allowed.
Decision will be entered under Rule 155.
Footnotes
*. Cases of the following petitioners are consolidated herewith: J. W. Brown and Shirley Brown, docket Nos. 5616-72 and 4922-73; John R. Taylor and Mary E. Taylor, docket No. 5619-72; David E. and Deborah M. Taylor, docket No. 5664-72; Robert S. Brown and Phyllis Brown, docket Nos. 5665-72 and 4921-73; and Brown, Gettler and Brown, Inc., docket No. 5691-72. ↩
1. During the years in issue the stock was owned as follows: J. W. Brown, 55 shares; Benjamin Gettler, 25 shares; Robert S Brown, 5 shares; Barbara B. Hild (daughter of J. W. Brown), 5 shares; Shirley Brown (wife of J. W. Brown), 10 shares.↩
2. Operating expenses do not include depreciation, interest, or capitalized repairs.↩
3. All section references are to the Internal Revenue Code of 1954, as in effect for the taxable years involved.↩
4. Petitioners involved in this issue are Benjamin Gettler, J. W. Brown, Robert S Brown, and Brown, Gettler & Brown, Inc.↩
5. In their petitions, however, they assert that 71.4 percent, or $178,500 should be allocated to depreciable improvements and accordingly seek a refund. These latter percentages correspond to the results of the appraisal made by the Supervisor of Industrial Real Estate in Hamilton County for the County Auditor and are the relative values by which the property is currently carried on the tax rolls.↩
6. Petitioners make the same argument regarding Mr. Spilker's selection of comparable land sales.↩
7. See Stanley J. Prescott,T. C. Memo 1969-76↩.